Mary FOWLER, Angela Mills and
Amanda Kerr, Plaintiffs,

v.

SUNRISE CARPET INDUSTRIES, INC.
and Larry Hankins, Defendants.

Civ. A. No. 4:94–cv–236–HLM.

United States District Court,
N.D. Georgia,
Rome Division.

Jan. 3, 1996.

**1566**

Alexander McArthur Irvin, Sandra Kaye, Stuart, Irvin, Stanford & Kessler, Atlanta, GA, for plaintiffs.

Genevieve L. Frazier, Sandra Gail Kirk, Chambers, Mabry, McClelland & Brooks, Atlanta, GA, Robert Harris Smalley, III, McCamy, Phillips, Tuggle & Fordham, Dalton, GA, for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on Defendant Sunrise Carpet's ("Defendant Sunrise's") Motion For Waiver Of Page Limitation [23] and Defendant Sunrise's Motion For Summary Judgment [24].

1. The Court also will consider Plaintiffs' brief, even though Plaintiffs' brief exceeds twenty-five

## I. Waiver Of Page Limitation

Local Rule 220–1(d) provides that "[a]bsent **prior permission** of the Court, briefs filed in support of a motion or in response to a motion are limited in length to twenty-five (25) double-spaced pages." LR 220–1(d) NDGa (emphasis added). Defendant Sunrise's brief in support of its Motion For Summary Judgment is eighty-nine pages in length. Defendant Sunrise did not obtain the Court's permission to exceed twenty-five pages, **before** Defendant Sunrise submitted the brief. Nonetheless, in the interest of judicial efficiency, the Court will consider Defendant Sunrise's brief.[1] In the future, however, counsel would be wise to get the Court's permission **before** drafting a brief that exceeds twenty-five (25) pages.

## II. Defendant Sunrise's Motion For Summary Judgment

### A. Summary Judgment Standard

█ Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A district court "can only grant summary judgment 'if **everything** in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986) (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980)).

█ It has long been established that the party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged by "'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex*

pages as well.

*Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In assessing whether the movant has met this burden, **the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.** *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Once the moving party has supported its motion adequately, the nonmovant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Ryder Int'l Corp. v. First American Nat'l Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 ("[I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). Disputed facts which do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment because such facts are not material. *Id.*

In addition to materiality, courts also must consider the genuineness of the alleged dispute. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. "Where the record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). "[T]his standard mirrors the standard for a directed verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. "[T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

### B. Facts

Keeping in mind that, when deciding a motion for summary judgment, the Court "must view the evidence and all factual inferences in the light most favorable to the party opposing the motion," the Court now will give a general statement of facts. *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). This statement does not represent actual findings of fact and it is given simply to place the Court's legal analysis within the context of a specific case or controversy.

Defendant Hankins was hired by Defendant Sunrise in April of 1992. Before being terminated on August 11, 1994, Defendant Hankins was the Manager of Research and Development ("R & D") for Defendant Sunrise.

### 1. Facts Relevant To Plaintiff Kerr

In June of 1992, Plaintiff Kerr was transferred into R & D, where Defendant Hankins was her supervisor. During 1992, Defendant Hankins asked Plaintiff Kerr questions about Plaintiff Kerr's sex life. Defendant Hankins asked Plaintiff Kerr, for example, whether Plaintiff Kerr had tried oral sex, whether she masturbated and which "positions" she preferred during sexual intercourse. Affidavit of Plaintiff Kerr at ¶ 3. Defendant Hankins also asked Plaintiff Kerr what Plaintiff Kerr's bra size was, whether Plaintiff Kerr had lost her virginity[2] and whether Plaintiff

---

**2.** At the time Plaintiff Kerr worked for Defendant Hankins, Plaintiff Kerr was a recent high school graduate.

Kerr's boyfriend satisfied her sexually. Deposition of Plaintiff Kerr at 16, 50, 75.

In addition to asking Plaintiff Kerr about her sex life, Defendant Hankins shared intimate details of his sex life with Plaintiff Kerr. Defendant Hankins told Plaintiff Kerr about Defendant Hankins's wife having oral sex with him and about his sexual activity with a business acquaintance in California. Defendant Hankins also shared his views on other female employees' bodies with Plaintiff Kerr. In November of 1992, Defendant Hankins tried to get Plaintiff Kerr to make a wager with him regarding the Atlanta Braves. Under Defendant Hankins's wager, Plaintiff Kerr would have been required to have sex with Defendant Hankins, if Plaintiff Kerr lost the wager. *Id.* at 68–69.

At some point, before Plaintiff Kerr reported Defendant Hankins's offensive conduct, Defendant Hankins told Plaintiff Kerr that, if Plaintiff Kerr stayed in R & D, Defendant Hankins would make sure Plaintiff Kerr got raises. Affidavit of Plaintiff Kerr at ¶ 8. Defendant Hankins, for example, told Plaintiff Kerr she could be making up to $9 per hour within a year. Deposition of Plaintiff Kerr at 30. Defendant Hankins also told Plaintiff Kerr that, if Plaintiff Kerr reported Defendant Hankins's offensive conduct, "who did [Plaintiff Kerr] think that they would fire, [Plaintiff Kerr] being just an employee that made $5 an hour or [Defendant Hankins]." *Id.* at 43.

On November 17, 1992, Plaintiff Kerr talked with Jennifer Hackney, a personnel assistant ("Personnel Assistant Hackney"), about Defendant Hankins's harassing conduct. Plaintiff Kerr told Personnel Assistant Hackney that Defendant Hankins "was saying things inappropriate to her" and that "she wanted to be moved." Deposition of Personnel Assistant Hackney at 18–19. After Personnel Assistant Hackney told James Hammontree, Defendant Sunrise's Personnel Director ("Personnel Director Hammontree" or "Hammontree"), about her conversation with Plaintiff Kerr, Personnel Director Hammontree interviewed Plaintiff Kerr. *Id.* at 20.

Without discussing the specific content of Defendant Hankins's harassing comments, Plaintiff Kerr told Personnel Director Hammontree that Defendant Hankins was saying things that made Plaintiff Kerr "uncomfortable" and that Plaintiff Kerr "want[ed] out of [Defendant Hankins's] department." Deposition of Personnel Director Hammontree at 9. Personnel Director Hammontree did not ask Plaintiff Kerr about the specific content of Defendant Hankins's harassing comments. *Id.* at 9, 10.

After talking with Plaintiff Kerr, Personnel Director Hammontree interviewed Defendant Hankins. Hammontree asked Defendant Hankins whether Defendant Hankins had made "offensive" comments to Plaintiff Kerr. *Id.* at 11. Personnel Director Hammontree did not ask Defendant Hankins about the specific content of Defendant Hankins's comments. Defendant Hankins told Hammontree that he had only been "kidding" with Plaintiff Kerr. Personnel Director Hammontree told Defendant Hankins "[y]ou know, we need to be careful." Deposition of Defendant Hankins at 84. Hammontree also told Defendant Hankins "[y]ou can't kid about some things.... [t]his is one of them." Deposition of Personnel Director Hammontree at 11–12.

Personnel Director Hammontree also told Defendant Hankins that "we need to move [Plaintiff Kerr] and she doesn't want to pursue it any further as far as discipline towards you, or anything like that, so we'll just move her." Deposition of Defendant Hankins at 84. Personnel Director Hammontree conducted no further investigation of Plaintiff Kerr's complaint. Nor did he take any formal disciplinary action against Defendant Hankins.

On November 20, 1992, Plaintiff Kerr began working as a receptionist in a new department. Plaintiff Kerr's rate of compensation increased from $5.25 to $6.25 per hour. Deposition of Plaintiff Kerr at 12–13. After November 20, 1992, Defendant Hankins had no supervisory control over Plaintiff Kerr. *Id.* at 41. Plaintiff Kerr continued to work as a receptionist until September of 1993,

when, at her request, Plaintiff Kerr was transferred to a "mender" position. Once Plaintiff Kerr became a mender, her hourly rate of compensation eventually increased to $7.09.

In April of 1994, Defendant Hankins told Plaintiff Kerr that he "wanted [Plaintiff Kerr] in [Plaintiff Kerr's successor's] position, but you had to run your mouth." Affidavit of Plaintiff Kerr at ¶ 10. In June of 1994, while Plaintiff Kerr was standing in a supply room, Defendant Hankins "brushed against" Plaintiff Kerr so that Plaintiff Kerr "felt his genitals on [her] back." Deposition of Plaintiff Kerr at 37. Until this suit, Plaintiff Kerr did not report this particular incident to Defendant Sunrise.

On August 8, 1994, Plaintiff Kerr filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff Kerr, along with the other Plaintiffs, filed suit against Defendants on October 3, 1994. On April 12, 1995, Personnel Director Hammontree issued Plaintiff Kerr a written reprimand for talking to other employees about this suit. The reprimand stated that some employees had felt threatened and intimidated by Plaintiff Kerr. The reprimand also stated that any further "violations" of the same nature would result in Plaintiff Kerr being discharged. Within twenty-four hours of its issuance, Plaintiff Kerr's reprimand was withdrawn and removed from Plaintiff Kerr's personnel file. Affidavit of Personnel Director Hammontree at ¶ 13, 14. Plaintiff Kerr was told that the reprimand had been rescinded. *Id.*

### 2. Facts Relevant To Plaintiff Fowler

Before working for Defendant Sunrise, Plaintiff Fowler worked for a company called "Sample Backing." During the time that Plaintiff Fowler worked for Sample Backing, Defendant Hankins worked for "Lowes," where Defendant Hankins was one of Plaintiff Fowler's customers. In late 1991, or early 1992, while Plaintiff Fowler was making a sales call at Lowes, Defendant Hankins allegedly grabbed Plaintiff Fowler's shoulders and kissed Plaintiff Fowler. Deposition of Plaintiff Fowler at 116.

During the Fall of 1992, Plaintiff Fowler talked with Defendant Hankins about applying for a position, in R & D, with Defendant Sunrise. At the time of this conversation, Plaintiff Fowler was working with her father's business. Defendant Hankins told Plaintiff Fowler to indicate, on her application to Defendant Sunrise, that Plaintiff Fowler was being paid $8 per hour at her father's business. *Id.* at 67–68. Plaintiff Fowler was not being paid $8 per hour. Nonetheless, Plaintiff Fowler indicated she was being paid $8 per hour.[3]

Plaintiff Fowler began working for Defendant Sunrise, as Defendant Hankins's assistant, in December of 1992. The first day Plaintiff Fowler worked for Defendant Hankins, Defendant Hankins asked Plaintiff Fowler whether her breasts were real. Defendant Hankins told Plaintiff Fowler her breasts "didn't tend to sag" like some women's breasts. Deposition of Plaintiff Fowler at 115. Also, during Plaintiff Fowler's first week on the job, Defendant Hankins made a comment about another female employee wearing tight pants. Defendant Hankins told Plaintiff Fowler that women who wear tight pants "want[ ] it." *Id.* at 119–20. That same week, Plaintiff Fowler invited Defendant Hankins, his wife and his son to go fishing at Plaintiff Fowler's pond.

During December of 1992, Defendant Hankins told Plaintiff Fowler that his wife would "lay him out nude and kiss him all over" on his birthday. Defendant Hankins also told Plaintiff Fowler that he and his wife had "oral sex simultaneously" while watching a Christmas video. *Id.* at 121. Plaintiff Fowler told Defendant Hankins she did not wish to hear about Defendant Hankins's sex life. *Id.* at 122.

At some point in December of 1992, Defendant Hankins told Plaintiff Fowler that "it

---

**3.** Defendant Sunrise claims the fact that Plaintiff Fowler wanted to work for Defendant Hankins, after Defendant Hankins allegedly kissed Plaintiff Fowler at Lowes, shows Plaintiff Fowler welcomed Defendant Hankins's sexual advances.

Defendant Sunrise claims this theory is supported further by the fact that Plaintiff Fowler was willing to falsify information on her application to Defendant Sunrise, so that Plaintiff Fowler could work for Defendant Hankins.

didn't matter what the men [who worked for Defendant Sunrise] did," as long as they made money for the company. Affidavit of Plaintiff Fowler at ¶ 3. Defendant Hankins also told Plaintiff Fowler that "the girl always ends up on the short end" when Defendant Sunrise investigates sexual misconduct. Affidavit of Plaintiff Fowler at ¶ 3. For a 1992 Christmas gift, Plaintiff Fowler gave Defendant Hankins a clock. The clock was engraved with a message that stated Defendant Hankins was a wonderful boss and friend.[4]

In January of 1993, while Defendant Hankins was removing a pair of scissors from a drawer in Plaintiff Fowler's desk, Defendant Hankins stated "I'm going to get in your drawers, Mary, or I love getting in Mary's drawers." Deposition of Plaintiff Fowler at 123. Also, during January of 1993, Defendant Hankins told Plaintiff Fowler another female employee was unhappy because "her husband wasn't satisfying her." *Id.* at 123. Defendant Hankins stated that "he would like to take [the female employee] in his office and shut the door and throw her across the desk and give her what she needs." *Id.* at 123. Until this suit, Plaintiff Fowler never reported any of the conduct, discussed above, to Defendant Sunrise.

In January of 1993, Defendant Hankins required Plaintiff Fowler to attend a trade show in Atlanta, Georgia.[5] On January 16, 1993, two days after the trade show started, Plaintiff Fowler arrived in Atlanta. Plaintiff Fowler knew "they did not have a room for [her]" in Atlanta. *Id.* at 126. Defendant Hankins told Plaintiff Fowler he had a suite Plaintiff Fowler could share with him. *Id.* at 126. When Plaintiff Fowler arrived at the trade show, Plaintiff Fowler left her luggage in Defendant Hankins's hotel room. The room was not a suite. Defendant Hankins told Plaintiff Fowler there were no rooms available for her. Plaintiff Fowler did not check to see whether she could find another hotel room. *Id.* at 129.

Plaintiff Fowler agreed to have dinner with Defendant Hankins on the night of January 16, 1993. Plaintiff Fowler and Defendant Hankins drank wine with their dinner. After dinner, Defendant Hankins and Plaintiff Fowler went back to Defendant Hankins's hotel room and consumed more wine. While Defendant Hankins and Plaintiff Fowler were looking out the window of the hotel room, Defendant Hankins grabbed Plaintiff Fowler, pushed her on the floor and put his face on her skirt.

Plaintiff Fowler asked Defendant Hankins to stop and told Defendant Hankins she was not attracted to him. Deposition of Plaintiff Fowler at 133–34. Defendant Hankins removed Plaintiff Fowler's skirt and continued touching Plaintiff Fowler. *Id.* at 134. Plaintiff Fowler told Defendant Hankins she needed to take a shower to "freshen up." *Id.* at 134. As Plaintiff Fowler walked into the bathroom, Defendant Hankins allegedly "pushed [her] over" and had sexual intercourse with her. *Id.* at 134.

After this incident, Plaintiff Fowler did not leave Defendant Hankins's hotel room, even though Plaintiff Fowler's car was parked near the hotel. Instead, Plaintiff Fowler took a shower and put on a bath robe. Deposition of Plaintiff Fowler at 136. When Plaintiff Fowler finished her shower, Plaintiff Fowler started walking towards a cot in Defendant Hankins's room. Defendant Hankins told Plaintiff Fowler to "get in the bed." *Id.* at 137. Defendant Hankins also told Plaintiff Fowler he would not "bother" her anymore. Plaintiff Fowler and Defendant Hankins slept in the same bed on the night of January 16, 1993.

On the Monday following the trade show weekend, Plaintiff Fowler told Defendant Hankins "there's a word for what you did to me" and that she had "told [Defendant Hankins] no." *Id.* at 140. Defendant Hankins replied that, when a woman says no, she really means yes. *Id.* at 140. Until this suit, Plaintiff Fowler never reported the trade

---

**4.** Defendant Sunrise claims this gift is further proof that Plaintiff Fowler welcomed Defendant Hankins's sexual advances.

**5.** Defendant Sunrise claims Plaintiff Fowler voluntarily attended the show, because Plaintiff Fowler and Defendant Hankins were having an affair.

show "rape" to Defendant Sunrise, or to the police.[6] *Id.* at 142.

On an unspecified day in late January, or early February, 1993, Defendant Hankins told Plaintiff Fowler that other "girls" wanted Plaintiff Fowler's job so they could work with Defendant Hankins. *Id.* at 143. On this same unspecified day, at approximately 5:00 p.m., Defendant Hankins locked Plaintiff Fowler's office door as Plaintiff Fowler was attempting to leave work. When Plaintiff Fowler walked around her desk, Defendant Hankins told Plaintiff Fowler he wanted to hug Plaintiff Fowler.

Defendant Hankins allegedly grabbed Plaintiff Fowler and began hugging Plaintiff Fowler, while her "arms were down." *Id.* at 144. Defendant Hankins then dropped to his knees and put his face on Plaintiff Fowler's skirt. Plaintiff Fowler asked Defendant Hankins to "stop." As Defendant Hankins tried to remove Plaintiff Fowler's skirt, Plaintiff Fowler asked Defendant Hankins to "stop" and tried to prevent Defendant Hankins from removing her skirt. *Id.* at 145. Defendant Hankins removed Plaintiff Fowler's skirt and had sexual intercourse with Plaintiff Fowler. Although Plaintiff Fowler was crying during the intercourse, Plaintiff Fowler did not "yell for help." Deposition of Plaintiff Fowler at 145.

On another afternoon, during February of 1993, this same type of incident occurred a second time in Plaintiff Fowler's office. Plaintiff Fowler did not yell for help. Also, as with the previously alleged rapes, Plaintiff Fowler did not report Defendant Hankins's actions to the police, or to Defendant Sunrise.

"A day prior to one of the rapes," Defendant Hankins told Plaintiff Fowler he had to fire a woman at a previous job, because the woman told Defendant Hankins she was going to "do something about" Defendant Hankins patting her bottom. Affidavit of Plaintiff Fowler at ¶ 4. Defendant Hankins told Plaintiff Fowler he would "hate for something like that to happen to [Plaintiff Fowl-

er]," because she would "lose everything." *Id.* at ¶ 4.

During March of 1993, Defendant Hankins talked with Plaintiff Fowler about "women that try to cause trouble." Defendant Hankins told Plaintiff Fowler that Plaintiff Kerr "had ruined herself" by getting transferred to another department. Deposition of Plaintiff Fowler at 156–58. Also, during March of 1993, Plaintiff Fowler offered to leave her job with Defendant Hankins. *Id.* at 160.

On one occasion, in April of 1993, Defendant Hankins allegedly kissed Plaintiff Fowler on the mouth as Plaintiff Fowler was sitting at her desk. Plaintiff Fowler cried after this incident. On another occasion, Defendant Hankins "grabbed [Plaintiff Fowler's] bottom" and said he "wanted some of that pretty fanny." *Id.* at 275.

On September 29, 1993, Plaintiff Fowler sent an anonymous letter to Johnny West, Defendant Sunrise's CEO ("CEO West"). In this letter, Plaintiff Fowler asked CEO West to make it clear to Defendant Sunrise's male employees that "when a woman's answer is 'No,' that it is final, non-negotiable, and unconditional." Exhibit B To Defendant Sunrise's Motion For Summary Judgment. Defendant Sunrise tried to discover the author of Plaintiff Fowler's anonymous letter. On October 7, 1993 Personnel Director Hammontree asked Plaintiff Fowler whether Defendant Hankins was "bothering" her. Plaintiff Fowler "shook [her] head no." Deposition of Plaintiff Fowler at 85.

After receiving Plaintiff Fowler's anonymous letter, CEO West and Personnel Director Hammontree had a breakfast meeting with all of Defendant Sunrise's supervisors. Plaintiff Fowler's anonymous letter was read to the supervisors at this meeting. CEO West told the supervisors that Defendant Sunrise would not tolerate sexual harassment. Supervisors were asked to sign a form that, in addition to giving an EEOC definition of sexual harassment, stated:

> SUNRISE recognizes an obligation to provide a work place which is free of harass-

---

**6.** As noted below, Plaintiff Fowler did complain about sexual harassment in an anonymous letter she sent to Defendant Sunrise. The letter did not, however, state that a Sunrise employee had been raped.

ment of any kind. As a management employee, you are responsible for maintaining this atmosphere. Your personal conduct must be beyond reproach and you must be sure your actions cannot be interpreted by any employee as harassment.

*See* Exhibit 12 To Deposition of James Hammontree.

Defendant Sunrise's supervisors also were asked to tell their subordinates that Defendant Sunrise would not tolerate sexual harassment.

Following the supervisors' meeting, Anthony West, the son of CEO West, told Plaintiff Fowler she needed to train a specified male employee to "do [her] job." Deposition of Plaintiff Fowler at 282. Anthony West also told Plaintiff Fowler she should move her desk to another office—the merit office. *Id.* at 284. For some unknown reason, Plaintiff Fowler never moved her desk away from Defendant Hankins's office. *Id.* at 285. In December of 1993, Plaintiff Fowler gave Defendant Hankins some cologne for a Christmas gift. *Id.* at 101.

In June of 1994, Defendant Hankins fondled himself in front of Plaintiff Fowler "almost every time he entered [Plaintiff Fowler's] office." Affidavit of Plaintiff Fowler at ¶ 8. On June 24, 1994, Defendant Hankins told Plaintiff Fowler he would be willing to help Plaintiff Fowler financially, since Plaintiff Fowler had "a house payment and [her] sons to think about." *Id.* at ¶ 14. On June 29, 1994, Defendant Hankins told Plaintiff Fowler her hips had gotten wider and that he would "still look at that pretty little fanny, whether [Plaintiff Fowler] like[d] it or not." *Id.* at ¶ 15.

On June 30, 1994, Defendant Hankins told Plaintiffs Fowler and Mills that he became violent when he was "emotionally hurt." *Id.* at ¶ 16. Defendant Hankins then related a story to Plaintiffs Fowler and Mills about how Defendant Hankins once grabbed his wife by the throat. *Id.* at ¶ 16.

Plaintiff Fowler has received raises in her hourly rate of compensation throughout her

employment with Defendant Sunrise. Plaintiff Fowler filed a charge of discrimination with the EEOC on August 31, 1994. Plaintiff Fowler, along with the other Plaintiffs, filed this suit against Defendants on October 3, 1994.

On April 12, 1995, Personnel Director Hammontree issued a written reprimand to Plaintiff Fowler for contacting other employees about this suit. The reprimand stated that some employees had felt threatened and intimidated by Plaintiff Fowler.[7] The reprimand also stated that any further "violations" of the same nature would result in Plaintiff Fowler being terminated. On June 21, 1995, as part of the settlement of a complaint Plaintiff Fowler had filed with the National Labor Relations Board, Defendant Sunrise agreed to withdraw Plaintiff Fowler's reprimand. Affidavit of Personnel Director Hammontree at ¶ 18. The reprimand was removed from Plaintiff Fowler's personnel file.

### 3. Facts Relevant To Plaintiff Mills

In April of 1994, Plaintiff Mills was hired to work with Defendant Hankins. Shortly after Plaintiff Mills began working for Defendant Hankins, Defendant Hankins told Plaintiff Mills "dirty jokes." Affidavit of Plaintiff Mills at ¶ 3. Defendant Hankins also asked Plaintiff Mills whether Plaintiff Mills was sexually active and what bra size Plaintiff Mills wore. *Id.* at ¶ 4, 5. Plaintiff Mills told Defendant Hankins they "should not discuss such things." *Id.* at ¶ 4. In May of 1994, Defendant Hankins asked Plaintiff Mills if he could give Plaintiff Mills a massage. Defendant Hankins also told Plaintiff Mills he would pay for Plaintiff Mills to learn how to give massages.

At some point in May or June of 1994, Defendant Hankins allegedly "grabbed [Plaintiff Mills's] inner thigh" while Plaintiff Mills was standing in a chair in a work room. Deposition of Plaintiff Mills at 59. Plaintiff Mills told Defendant Hankins not to "let it happen again." *Id.* at 59.

---

**7.** According to Defendant Sunrise, Plaintiff Fowler approached various Sunrise employees during, and after, working hours, and aggressively

tried to get the employees to talk with her attorneys about this suit.

On the afternoon of June 10, 1994, Defendant Hankins told Plaintiff Mills to sit down, because Defendant Hankins needed to talk with her. Once Plaintiff Mills was seated, Defendant Hankins closed his office door and tried, unsuccessfully, to massage Plaintiff Mills's shoulders. Next, Defendant Hankins seated himself in the chair beside Plaintiff Mills, grabbed Plaintiff Mills by the ankles and began rubbing her feet. *Id.* at 58. Plaintiff Mills told Defendant Hankins she did not want Defendant Hankins to massage her feet.

As Plaintiff Mills tried to walk away from Defendant Hankins, Defendant Hankins "went on up under [her] skirt under [her] panties and grabbed [her buttocks]." *Id.* at 58. Defendant Hankins also grabbed Plaintiff Mills by the shoulders, kissed her neck and asked her if he could engage in oral sex with her. *Id.* at 58. After "running out" of Defendant Hankins's office, Plaintiff Mills stayed in the rest room for approximately thirty minutes. *Id.* at 59.

On June 13, 1994, Plaintiff Mills told Bobby Morrison, Defendant Sunrise's Plant Manager ("Plant Manager Morrison"), that she did not like working for Defendant Hankins, because Defendant Hankins was "flirty" and "he liked to touch too much." [8] Deposition of Plaintiff Mills at 46–47. Plaintiff Mills told Plant Manager Morrison she had to be transferred away from Defendant Hankins, or she would quit. Plant Manager Morrison told Plaintiff Mills that Defendant Hankins "got on ... [Plaintiff Kerr's] nerves too." *Id.* at 47. Morrison also told Plaintiff Mills it would be three or four weeks before Plaintiff Mills could be transferred. Deposition of Plant Manager Morrison at 33. Until Plaintiffs filed this suit, none of Defendant Sunrise's officials interviewed Plaintiff Mills about her complaint. *Id.* at 47–48.

During the week of June 13, 1994, Plaintiff Mills also talked with Personnel Assistant Hackney about Defendant Hankins. Plaintiff Mills told Personnel Assistant Hackney that Defendant Hankins was "flirty." Deposition of Plaintiff Mills at 72–73. Personnel Assistant Hackney asked Plaintiff Mills

whether there was anything else Plaintiff Mills wanted to say about Defendant Hankins's conduct. *Id.* at 73. Plaintiff Mills said "no." *Id.* at 73.

On June 28, 1994, Defendant Hankins asked Plaintiff Mills to take a nap with him in his office. "Around that same time," Defendant Hankins told Plaintiff Mills she could "go far" in his department. Affidavit of Plaintiff Mills at ¶ 8. Also, in June of 1994, Defendant Hankins told Plaintiff Mills he became violent when he was hurt by someone he liked. *Id.* at 55.

During 1994, Plaintiff Mills received three raises in her hourly rate of compensation. On July 31, 1994, Plaintiff Mills filed a charge of discrimination with the EEOC. Plaintiff Mills, along with the other Plaintiffs, filed this suit against Defendants on October 3, 1994. On April 12, 1995, Personnel Director Hammontree issued Plaintiff Mills a written reprimand for talking with other employees about this suit. The reprimand stated that some employees had felt threatened and intimidated by Plaintiff Mills. The reprimand also stated that any further "violations" of the same nature would result in Plaintiff Mills being terminated. Within twenty-four hours of its issuance, Plaintiff Mills's reprimand was withdrawn and removed from Plaintiff Mills's personnel file. Affidavit of Personnel Director Hammontree at ¶ 13, 14. Plaintiff Mills was told her reprimand had been withdrawn. *Id.*

### 4. Facts Relevant To All Plaintiffs

"As early as the beginning of 1992," Defendant Sunrise had EEOC posters placed in an employee break room. Defendant Sunrise's Brief In Support of Motion For Summary Judgment at 30. These posters gave a general definition of sexual harassment. Additionally, Defendant Sunrise had its own "sexual harassment policy." *Id.* This policy, like the EEOC posters, gave a general definition of sexual harassment. *See* Exhibit C To Defendant Sunrise's Motion For Summary Judgment. The policy also stated that employees were responsible for maintaining a harassment free work environment. *Id.*

---

**8.** Plant Manager Morrison has testified that Plaintiff Mills only told him Defendant Hankins was "bugging the fool out of [her]." Deposition of Plant Manager Morrison at 33.

At all times relevant to this suit, Defendant Sunrise's Personnel Policy Manual contained an "Open Door Policy." This policy states:

> Your company believes in an 'open door' policy for airing any problems that might arise. If you have a complaint, criticism, question, or suggestion regarding your job or work, **your first step is to talk things over with your supervisor.** Such discussion will not be held against you in any way. Your supervisor will give you a specific answer on whatever points you raise, or will tell you when they will have an answer for you.
>
> If you are not fully satisfied with the response or decision, you can ask for a conference with you, your supervisor, and their supervisor.

*See* Exhibit 1 To Deposition of Personnel Assistant Hackney (emphasis added).

On July 25, 1994, Defendant Sunrise received a letter from Plaintiffs' counsel, informing Defendant Sunrise of Plaintiffs' allegations of sexual harassment. Immediately after receiving the letter, Personnel Director Hammontree spoke with Plaintiffs and Defendant Hankins. On August 11, 1994, Defendant Sunrise terminated Defendant Hankins, "because he admitted to having consensual sexual intercourse" with Plaintiff Fowler "during company time on company property." Defendant Sunrise's Brief In Support of Motion For Summary Judgment at 29.

### C. Overview Of Plaintiffs' Claims And Defendant Sunrise's Arguments In Support Of Its Motion For Summary Judgment

Plaintiffs assert three Title VII claims against Defendant Sunrise. First, Plaintiffs claim they were subjected to *quid pro quo* sexual harassment. Second, Plaintiffs claim they were subjected to hostile work environment sexual harassment. Third, Plaintiffs claim Defendant Sunrise retaliated against them for bringing this suit. Plaintiffs also assert the following pendent state law claims: (1) intentional infliction of emotional distress; (2) battery; and (3) negligent retention.

Defendant Sunrise makes seven arguments to support its Motion For Summary Judg-

ment. First, Defendant Sunrise argues that Plaintiffs Kerr and Fowler failed to file their EEOC charges within 180 days after Defendant Hankins's last acts of sexual harassment. Defendant Sunrise claims Plaintiffs Kerr and Fowler cannot overcome the 180-day statutory limitation, by claiming Defendant Hankins's conduct amounted to a continuing violation.

Second, Defendant Sunrise argues that, because Plaintiffs' reactions to Defendant Hankins's conduct did not alter the terms, conditions or privileges of Plaintiffs' employment, Plaintiffs' *quid pro quo* sexual harassment claims must fail. Third, as to Plaintiffs' hostile work environment claims, Defendant Sunrise argues that: (a) Defendant Hankins's conduct was not unwelcome by Plaintiffs; (b) Defendant Hankins's conduct did not affect a term, condition, or privilege of Plaintiffs' employment; (c) Defendant Hankins's conduct was not severe enough, or pervasive enough, to show that Defendant Sunrise knew, or should have known, of Defendant Hankins's conduct; and (d) Defendant Sunrise took prompt remedial action to stop Defendant Hankins's objectionable conduct as soon as Defendant Sunrise learned of that conduct.

Fourth, Defendant Sunrise argues that, because no adverse employment action was taken against Plaintiffs, Plaintiffs' retaliation claims must fail. Fifth, Defendant Sunrise argues that, because its actions, or inactions, were not outrageous, Plaintiffs' intentional infliction of emotional distress claims must fail. Sixth, Defendant Sunrise argues that, because it cannot be held liable for the intentional torts of its employees, Plaintiffs' battery claims must fail. Seventh, Defendant Sunrise argues that, because it never had reason to know of Defendant Hankins's alleged propensity to harass employees, Plaintiffs' negligent retention claims must fail.

### D. Discussion of Plaintiffs' Federal Claims

### 1. Whether Plaintiff Kerr's And Plaintiff Fowler's Title VII Claims Are Time Barred

Defendant Sunrise argues that Plaintiff Kerr's and Plaintiff Fowler's Title VII claims

are time barred, because Plaintiffs Kerr and Fowler did not file EEOC charges within 180 days after Defendant Hankins's last acts of harassment against them. Plaintiffs Kerr and Fowler argue that their Title VII claims are not time barred, because Defendant Hankins's harassing conduct amounted to a continuing violation.

For Plaintiff Kerr's and Plaintiff Fowler's Title VII claims to survive Defendant Sunrise's Motion For Summary Judgment, Plaintiffs Kerr and Fowler must show they filed EEOC charges "within 180 days of the 'alleged unlawful employment practice.'" *Beavers v. American Cast Iron Pipe, Co.,* 975 F.2d 792, 796 (11th Cir.1992) (quoting 42 U.S.C. § 2000e–5(e)(1)). It is undisputed that Plaintiffs Kerr and Fowler did not file EEOC charges within 180 days after their initial exposure to Defendant Hankins's harassing conduct. The issue to be decided, therefore, is whether Defendant Hankins's conduct amounted to a continuing violation.

■ The Eleventh Circuit has stated that:

> Where an employee charges an employer with continuously maintaining an illegal employment practice, [the employee] may file a valid charge of discrimination based upon that illegal practice until 180 days **after the last occurrence of an instance of that practice.**

*Beavers,* 975 F.2d at 796 (quoting with approval *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241, 249 (5th Cir.1980)). In other words, "[t]o establish a continuing violation, the plaintiff must prove a series of related acts, one or more of which falls within the 180 day period." *Mills v. Amoco Performance Prod., Inc.,* 872 F.Supp. 975, 986 (S.D.Ga.1994) (citation omitted) (cited by Plaintiffs and Defendant Sunrise).

■ Plaintiffs Kerr and Fowler both have alleged facts showing they were sexually harassed by Defendant Hankins, within 180 days of the dates they filed their EEOC charges. Plaintiff Kerr, for example, alleges that, within two months of the date Plaintiff Kerr filed her EEOC charge, Defendant

Hankins rubbed his genitals against her back. Similarly, Plaintiff Fowler alleges that, within two months of the date Plaintiff Fowler filed her EEOC charge, Defendant Hankins: (1) told Plaintiff Fowler he would look at her "pretty little fanny" whether she liked it or not; and (2) fondled his penis in her presence.

Because these actions were part of a series of related actions taken by Defendant Hankins, the Court concludes that Plaintiff Kerr's and Plaintiff Fowler's Title VII claims are not time barred. Accordingly, Defendant Sunrise's Motion For Summary Judgment is inappropriate as to this particular issue.

**2. Whether Summary Judgment Is Appropriate For Plaintiffs' Claims Of *Quid Pro Quo* Sexual Harassment**

■ "In a *quid pro quo* harassment case, the [employer] is strictly liable for the supervisor's harassment" of employees. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989). To establish a *prima facie* case of *quid pro quo* sexual harassment, an employee must prove: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions or privileges of employment. *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir.1987).

In the present case, there are, at the very least, genuinely disputed issues of material fact regarding: (1) whether Plaintiffs belong to a protected group [9]; (2) whether Plaintiffs were subjected to unwelcome sexual advances [10]; and (3) whether Plaintiffs experienced harassment based on their sex. The only issue to be decided, therefore, is whether a reasonable jury could find that Defendant Hankins conditioned tangible aspects of Plaintiffs' compensation, terms, conditions or privileges of employment on Plaintiffs' reactions to Defendant Hankins's harassing conduct.

---

**9.** Defendant Sunrise does not dispute this factor.

**10.** *See* discussion *infra* part II.D.3(a).

Plaintiffs Kerr and Fowler claim they experienced *quid pro quo* sexual harassment, because Defendant Hankins allegedly threatened to fire them if they reported Defendant Hankins's harassing conduct. Plaintiffs Kerr and Fowler cite *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554 (11th Cir.1987) to support their claim. Defendant Sunrise argues that, because Defendant Hankins did not actually fire Plaintiffs Kerr and Fowler, those Plaintiffs cannot state a claim for *quid pro quo* sexual harassment.

In *Sparks,* the plaintiff, a female employee, sued her employer and her immediate supervisor, because the supervisor sexually harassed the plaintiff. While the supervisor was harassing the plaintiff, the supervisor frequently reminded the plaintiff that he could fire the plaintiff if the plaintiff did not comply with his sexual advances. *Sparks,* 830 F.2d at 1560. The *Sparks* court held that, because the supervisor was acting as his employer's agent when the supervisor threatened to fire the plaintiff, the employer was directly liable for the supervisor's harassment, **even if the employer did not have notice of the harassment.** *Id.* at 1558–60.

The *Sparks* court reasoned that, when the supervisor threatened to fire the plaintiff, the supervisor used authority granted to him by his employer to further his harassment of the plaintiff. *Id.* at 1559. The court stated that "where the supervisor exercises the authority actually delegated to him by his employer, by making **or threatening to make** decisions affecting the employment status of his subordinates," the employer can be directly liable.[11] *Sparks,* 830 F.2d at 1559 (emphasis added) (citations and quotations omitted).

■ Under the Court's interpretation of *Sparks* and its progeny, an employee can establish a *quid pro quo* sexual harassment claim by showing that the employee's supervisor threatened to take adverse action against the employee, if the employee did not comply with, or tolerate, the supervisor's sexual advances. *See Sparks,* 830 F.2d at 1558–60; *Steele,* 867 F.2d at 1316–17 (interpreting the holding and rationale of the *Sparks* decision). *But see Gary v. Long,* 59 F.3d 1391, 1396 (D.C.Cir.1995) (repeated threats of adverse job consequences, if not carried out, fail to establish a claim of *quid pro quo* sexual harassment).

In the present case, Defendant Hankins did not threaten to fire Plaintiffs Kerr and Fowler if they rejected his sexual advances. Instead, Defendant Hankins threatened to fire Plaintiffs Kerr and Fowler if they **reported** his sexual advances.[12] The Court believes this is a meaningless distinction, because reporting a supervisor's sexual advances is one way an employee can reject those sexual advances.

■ Also, by implicitly threatening to fire Plaintiffs Kerr and Fowler if they reported his harassing conduct, Defendant Hankins created an environment in which he could harass Plaintiffs without fear of reprisal. Defendant Hankins's message to Plaintiffs Kerr and Fowler was clear: tolerate my sexual harassment on a regular basis, without reporting that harassment, or lose your job.[13] The Court, therefore, concludes that a reasonable jury could find Defendant Hankins subjected Plaintiffs Kerr and Fowler to *quid pro quo* harassment, by threatening to fire Plaintiffs Kerr and Fowler if they reported Defendant Hankins's harassing conduct.

---

**11.** Defendant Sunrise does not claim Defendant Hankins lacked actual or apparent authority to discipline, fire, or promote his subordinates.

**12.** Defendant Hankins told Plaintiff Kerr that, if Plaintiff Kerr reported Defendant Hankins's offensive conduct, "who did [Plaintiff Kerr] think that they would fire, [Plaintiff Kerr] being just an employee that made $5 an hour or [Defendant Hankins]." Deposition of Plaintiff Kerr at 43. Defendant Hankins told Plaintiff Fowler he had to fire a female subordinate at another job, because the female subordinate told Defendant Hankins she was going to "do something about" Defendant Hankins patting her buttocks. Defendant Hankins then told Plaintiff Fowler he would "hate for something like that to happen to [Plaintiff Fowler]," because Plaintiff Fowler would "lose everything." Affidavit of Plaintiff Fowler at ¶ 4.

**13.** If these alleged threats actually were made, it is not surprising that Plaintiff Fowler "shook her head no" when Personnel Director Hammontree asked Plaintiff Fowler whether Defendant Hankins was "bothering" her.

Plaintiffs Kerr and Mills claim they experienced *quid pro quo* sexual harassment, because their reactions to Defendant Hankins's conduct—seeking transfers—affected tangible aspects of their employment. Plaintiffs' Brief In Opposition To Defendant Sunrise's Motion For Summary Judgment at 40. More specifically, Plaintiffs Kerr and Mills argue that, when they were "constructively forced" to transfer out of R & D, they were deprived of the opportunity to gain exposure to Defendant Sunrise's R & D division. The Court disagrees with Plaintiffs' analysis of their situation for two reasons.

First, Plaintiffs Kerr and Mills have introduced no evidence showing their transfers affected a tangible aspect of their compensation, terms, conditions or privileges of employment. Plaintiff Kerr's and Plaintiff Mills's transfers were not demotions. Additionally, after their transfers, Plaintiffs Kerr and Mills continued to receive increases in their hourly rates of compensation.

 Second, Plaintiffs have cited no authority, and the Court has found none, to support the proposition that a voluntary or "constructively forced" transfer can amount to *quid pro quo* harassment. "Quid pro quo sexual harassment occurs when an **employer** changes an employee's conditions of employment;" not when the employee, through her own actions, changes her conditions of employment. *Virgo v. Riviera Beach Assoc's, Ltd.,* 30 F.3d 1350, 1362 (11th Cir.1994) (emphasis added). The Court, therefore, concludes that Plaintiff Kerr's and Plaintiff Mills's voluntary/constructively forced transfers cannot support a claim of *quid pro quo* harassment.

Plaintiffs Kerr and Mills also claim they were exposed to *quid pro quo* harassment, because Defendant Hankins implicitly conditioned their opportunities for career advancement and job benefits on their submissions to his sexual advances. To support her claim, Plaintiff Kerr alleges that, before she complained about Defendant Hankins's harassing conduct, Defendant Hankins "kept telling her that, if [she] stayed in his department, he would make sure [she] kept getting raises." Affidavit of Plaintiff Kerr at ¶ 8.

To support her claim, Plaintiff Mills alleges that, on June 28, 1994, Defendant Hankins asked Plaintiff Mills to take a nap with him. Plaintiff Mills further alleges that "[a]round that same time," Defendant Hankins: (1) told Plaintiff Mills she should stay in "his department" because she could "go far;" and (2) resumed trying to massage her shoulders. *See* Affidavit of Plaintiff Mills at ¶ 8. Plaintiffs Kerr and Mills cite *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982) and *Mills v. Amoco Performance Products,* 872 F.Supp. 975 (S.D.Ga.1994) to support their claims.

In *Henson,* a male supervisor told the plaintiff, a female subordinate, the supervisor would help the plaintiff get permission to attend a police academy if the plaintiff had sex with him. *Id.* at 900. In *Mills,* a male supervisor told the plaintiff, a female subordinate, the supervisor would relieve the plaintiff of an unwanted cleaning assignment if the plaintiff would have sex with him. *Id.* at 981. In *Henson* and *Mills,* the supervisors' offers of job benefits were conditioned upon, and **immediately** accompanied by, requests for sexual favors. Although the plaintiffs in *Henson* and *Mills* refused their supervisors' offers, the courts found the plaintiffs may have experienced *quid pro quo* harassment.

In the present case, Plaintiffs Kerr and Mills do not allege that Defendant Hankins's offers of job benefits were immediately accompanied by requests for sexual favors. Thus, unlike *Henson* and *Mills,* the present case involves allegations of **implicit** *quid pro quo* harassment. *Henson* and *Mills,* therefore, are of only marginal value to the Court's analysis of this matter. A recent Ninth Circuit case involving implicit *quid pro quo* harassment, however, is relatively helpful to the Court.

In *Nichols v. Frank,* 42 F.3d 503 (9th Cir.1994), the court noted that "[t]he ability to identify implicit quid pro quo harassment accurately is important for two very different reasons." *Id.* at 512. First, an innocent party may suffer disastrous consequences if the charge of *quid pro quo* harassment is erroneous or based upon an unfortunate misunderstanding. The second reason involves

"precisely the opposite concern." *Id.* Implicit *quid pro quo* harassment "is far more likely to take place than is the explicit variety." *Id.* **"As time goes by and harassers learn that they can no longer victimize their prey at will, their actions become less overt."** *Id.* (emphasis added).

■ "In attempting to determine whether implicit quid pro quo harassment has occurred, the key is often the verbal nexus" between a discussion of job benefits and a request for sexual favors. *Nichols,* 42 F.3d at 512–13. "The tighter the nexus between [the two], the more likely that there has been an 'implicit' conditioning by the harasser." *Id.* at 513.

In *Nichols,* the female plaintiff asked her male supervisor for a two-week leave of absence. Before the supervisor granted the plaintiff's request, the supervisor asked the plaintiff to perform oral sex on him. Immediately after the plaintiff performed oral sex on the supervisor, the supervisor granted the plaintiff a two-week leave of absence. These facts led the *Nichols* court to conclude that "a supervisor's intertwining of a request for the performance of sexual favors with a discussion of actual or potential job benefits or detriments in a single conversation constitutes quid pro quo sexual harassment." *Id.* at 513.

■ Neither the Eleventh, nor the Ninth, Circuits have held, and this Court does not believe, that for an employee to state a claim of *quid pro quo* harassment, the employee's supervisor **must** have intertwined a discussion of job benefits and requests for sexual favors in a **single conversation.**[14] To the contrary, the Court believes that, without intertwining a discussion of job benefits and sexual favors in a single conversation, a creative supervisor can convey the message to a subordinate employee that the employee's career advancement and job benefits are conditioned upon the employee's response to the supervisor's sexual advances.[15]

■ The Court, therefore, holds that where a supervisor discusses potential job benefits or detriments with a subordinate employee, during the same time period that the supervisor is making sexual advances on the employee, a reasonable jury **may** find the supervisor implicitly conditioned the subordinate employee's receipt of job benefits on the employee's acceptance or tolerance of the supervisor's sexual advances.

■ At least three factors are relevant in deciding whether a claim for implicit *quid pro quo* harassment exists: (1) the frequency of the supervisor's sexual advances; (2) the length of time over which those advances occur; and (3) the tightness of the verbal/temporal nexus between the supervisor's sexual advances and the supervisor's discussion of job benefits or detriments.

■ If, for example, a supervisor makes repeated sexual advances over a period of two weeks and, within an hour of one of his sexual advances, the supervisor mentions potential job benefits or detriments to the harassed employee, a relatively strong case for implicit *quid pro quo* harassment may be established. If, on the other hand, the supervisor makes only one or two sexual advances over a period of two months, and several days separate the supervisor's sexual advances from the supervisor's discussion of job benefits or detriments, the employee may have a relatively weaker case for implicit *quid pro quo* harassment.[16]

■ Plaintiffs Kerr and Mills have alleged that, during the general time period Defendant Hankins made sexual advances towards them, Defendant Hankins discussed potential job benefits with them. Although their allegations do not present a textbook

---

14. Eleventh Circuit cases addressing *quid pro quo* harassment have involved facts in which supervisors' discussions of subordinates' potential job benefits were immediately accompanied by requests for sexual favors. *See, e.g., Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982). Thus, it appears the Eleventh Circuit has not addressed the issue of implicit *quid pro quo* harassment.

15. A contrary belief would be unrealistic given the realities of the modern workplace.

16. These hypotheticals should not be interpreted as establishing any bright-line rules. They are given only as examples to illustrate the application of the Court's three-factor test.

example of *quid pro quo* harassment, the Court believes a reasonable jury could find that, by using the authority Defendant Sunrise granted to him, Defendant Hankins implicitly conditioned Plaintiff Kerr's and Plaintiff Mills's job benefits on their acceptance or tolerance of Defendant Hankins's sexual advances. This decision is not altered by Defendant Sunrise's claim that Plaintiffs actually received job benefits, despite having refused Defendant Hankins's sexual advances. *See Mills v. Amoco Performance Prod., Inc.,* 872 F.Supp. 975, 989 (S.D.Ga.1994) (*prima facie* case of *quid pro quo* harassment not necessarily precluded where employee received benefit supervisor offered employee—avoiding an undesirable cleaning assignment—even though employee did not have sex with supervisor as requested). Accordingly, Defendant Sunrise's Motion For Summary Judgment is inappropriate as to this particular issue.

### 3. Whether Summary Judgment Is Appropriate For Plaintiffs' Claims of Hostile Work Environment Sexual Harassment

██ An employee asserting a claim of hostile work environment sexual harassment must prove the following factors to establish a *prima facie* case: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment. *See Henson,* 682 F.2d at 909. In addition to these four elements, the employee must prove, as a fifth element, that the employer knew or should have known of the harassment and failed to take prompt remedial action to stop the harassment. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989).

Defendant Sunrise does not contest the first or third factors of this five-part test. Rather, Defendant Sunrise claims: (A) Defendant Hankins's sexually-charged conduct was welcome by Plaintiffs; (B) Defendant Hankins's conduct was not sufficiently severe or pervasive so as to alter the conditions of Plaintiffs' employment and create an abusive working environment; and (C) Defendant Sunrise should not be liable for Defendant Hankins's harassing conduct, because Defendant Sunrise took prompt remedial action to stop that conduct.

#### (a) Whether Defendant Hankins's Sexual Harassment Of Plaintiffs Fowler And Mills Was Unwelcome

██ Conduct is unwelcome where "the employee did not solicit or incite it, and ... the employee regard[s] the conduct as undesirable or offensive." *Henson,* 682 F.2d at 903. Defendant Sunrise does not claim Plaintiff Kerr welcomed Defendant Hankins's harassing conduct. Defendant Sunrise does, however, claim that Plaintiffs Fowler and Mills welcomed Defendant Hankins's harassing conduct.

██ With regard to Plaintiff Fowler, Defendant Sunrise claims Plaintiff Fowler engaged in a voluntary sexual affair with Defendant Hankins. To support this claim, Defendant Sunrise notes that: (1) Plaintiff Fowler had lunch with Defendant Hankins on a regular basis; (2) Plaintiff Fowler gave Defendant Hankins Christmas gifts, including cologne; (3) Plaintiff Fowler remained in Defendant Hankins's hotel room after Defendant Hankins allegedly raped Plaintiff Fowler; and (4) Plaintiff Fowler never screamed for help when Defendant Hankins was allegedly raping her. Additionally, Defendant Sunrise claims Plaintiff Fowler solicited or incited Defendant Hankins's sexual advances when she "dressed in a revealing manner."

While these factors may lend support to Defendant Sunrise, the Court does not believe they establish that, as a matter of law, Plaintiff Fowler welcomed Defendant Hankins's sexual advances. Plaintiff Fowler claims she constantly told Defendant Hankins to "stop" and "No." Plaintiff Fowler also claims she was too scared and shocked to protest Defendant Hankins's conduct. Given Plaintiff Fowler's allegations, the Court does not believe summary judgment is appropriate as to the issue of whether Plaintiff Fowler welcomed Defendant Hankins's sexual advances.

■ With regard to Plaintiff Mills, Defendant Sunrise claims that, because Plaintiff Mills cursed and discussed the subject of massages, Plaintiff Mills welcomed all of Defendant Hankins's sexual advances. Plaintiff Mills claims that, among other things, Defendant Hankins pinched her inner thigh and reached under her skirt and panties to grab her buttocks. Plaintiff Mills argues that this alleged conduct was not welcomed by her. The Court concludes that, even if Plaintiff Mills cursed and discussed the subject of massages on a regular basis, a reasonable jury could find that Plaintiff Mills did not welcome Defendant Hankins's sexual advances.

**b. Whether Defendant Hankins's Harassing Conduct Was Sufficiently Severe And/Or Pervasive So As To Alter The Conditions Of Plaintiffs' Employment And Create An Abusive Working Environment**

■ When a workplace is filled with conduct that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 369, 126 L.Ed.2d 295, 301 (1993) (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 302.

These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at —— – ——, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03.

■ While "the effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive," psychological injury is not a prerequisite to a claim of hostile work environment harass-

ment. *Id.* at ——, 114 S.Ct. at 369, 126 L.Ed.2d at 303.

A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, **discourage employees from remaining on the job,** or keep them from advancing in their careers.

*Id.* at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 302 (emphasis added).

So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.

*Id.* at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 302 (citation omitted).

Defendant Sunrise claims Defendant Hankins's harassing conduct did not create a hostile work environment. To support this claim, Defendant Sunrise argues that: (1) Defendant Hankins's conduct amounted to nothing more than offensive utterances; (2) Defendant Hankins's conduct did not interfere with Plaintiffs' ability to effectively perform their jobs; and (3) Defendant Hankins's conduct did not cause Plaintiffs to suffer any psychological injury. The Court does not agree with Defendant Sunrise's claim.

■ Plaintiffs have introduced evidence that shows Defendant Hankins's alleged conduct was both severe and pervasive and, at times, physically threatening and humiliating. The Court believes a reasonable jury could find Defendant Hankins's conduct interfered with Plaintiffs' job performance and discouraged Plaintiffs from "remaining on the job" in R & D. *Harris,* at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 302. The Court, therefore, cannot say that, as a matter of law, Defendant Hankins's conduct did not create a hostile work environment. Accordingly, summary judgment is inappropriate as to this particular issue.

**c. Whether Defendant Sunrise May Be Liable For The Hostile Work Environment Created By Defendant Hankins**

■ An employer may be liable for a supervisor's harassment of employees where

the employer "knew or should have known of the harassment and failed to take prompt remedial action against the supervisor." *Steele,* 867 F.2d at 1316. An "employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment." *Henson,* 682 F.2d at 905 (citations omitted).

■ The Court believes a reasonable jury could find that Defendant Sunrise knew, or should have known, of Defendant Hankins's harassing behavior for two reasons. First, Plaintiffs Kerr and Mills told Defendant Sunrise, through its Personnel Director and Plant Manager, that Defendant Hankins was harassing them. Second, Defendant Hankins's harassing conduct was quite pervasive.[17] The only issue to be decided, therefore, is whether Defendant Sunrise took prompt remedial action that was reasonably calculated to stop Defendant Hankins's harassment of Sunrise employees.

■ An employer can demonstrate prompt remedial action was taken by showing: (1) the employer investigated claims of harassment through employee interviews; (2) the employer gave a strong, serious reprimand to the harassing employee; (3) the employer assured employees the harassment would stop; (4) the employer informed the harassing employee that future acts of harassment would result in suspension or termination; (5) the employer demoted or suspended the harassing employee; (6) the employer voluntarily monitored the harassing employee's future behavior; and, most importantly (7) the harassing employee actually stopped harassing other employees.[18]

*Steele,* 867 F.2d at 1316; *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 578 (10th Cir.1990); *Swentek v. USAIR Inc.,* 830 F.2d 552, 558 (4th Cir.1987); *Bivins v. Jeffers Vet Supply,* 873 F.Supp. 1500, 1508 (M.D.Ala.1994).

■ Plaintiff Mills claims that, on June 13, 1993, she told Plant Manager Morrison she wanted a transfer, because Defendant Hankins "liked to touch too much." Plant Manager Morrison's, and Defendant Sunrise's, only response was to tell Plaintiff Mills that Defendant Hankins got on Plaintiff Kerr's nerves too and that a transfer could take several weeks. These factual allegations show Defendant Sunrise did not take prompt remedial action to stop Defendant Hankins from harassing Plaintiff Mills. The Court, therefore, concludes that Defendant Sunrise's Motion For Summary Judgment is inappropriate as to Plaintiff Mills's claim of hostile work environment harassment.

Plaintiff Kerr's and Plaintiff Fowler's allegations present a much closer case. The Court acknowledges that Defendant Sunrise, through Personnel Director Hammontree, briefly interviewed Plaintiffs Kerr and Fowler about Defendant Hankins.[19] The Court also acknowledges that Defendant Sunrise took some action in response to the complaints it received from Plaintiffs Kerr and Fowler. Specifically, Defendant Sunrise: (1) casually reprimanded Defendant Hankins on a single occasion; (2) transferred Plaintiff Kerr; (3) had its supervisors sign a statement discussing sexual harassment; (4) advised Plaintiff Fowler, through CEO West's son, to train someone else to do her job and to move her desk away from Defendant Han-

---

17. This is especially true of Defendant Hankins's treatment of Plaintiff Fowler. Three factors lead the Court to conclude that Defendant Sunrise knew, or should have known, of Defendant Hankins's harassment of Plaintiff Fowler: (1) Defendant Sunrise had received a complaint of harassment from Plaintiff Fowler's predecessor; (2) after receiving Plaintiff Fowler's anonymous letter, Personnel Director Hammontree suspected Defendant Hankins might be harassing Plaintiff Fowler (*see* Personnel Director Hammontree's Deposition at 37–38); and (3) Defendant Hankins's harassment of Plaintiff Fowler was pervasive.

18. Obviously, this is not an exhaustive list.

19. Without asking Plaintiff Kerr about the specific content of Defendant Hankins's inappropriate comments, Personnel Director Hammontree talked to Plaintiff Kerr about her problem with Defendant Hankins. After Defendant Sunrise received Plaintiff Fowler's anonymous letter, Personnel Director Hammontree asked Plaintiff Fowler whether Defendant Hankins had "bothered" her.

kins's office; and (5) eventually transferred Plaintiff Mills.

Defendant Sunrise, however, did not assure Plaintiff Kerr, or any other Plaintiff, that Defendant Hankins would stop harassing them. *Steele,* 867 F.2d at 1313. Defendant Sunrise did not tell Defendant Hankins his inappropriate conduct had to stop immediately or that future acts of harassment could result in suspension or termination. *Steele,* 867 F.2d at 1313; *Swentek,* 830 F.2d at 558; *Bivins,* 873 F.Supp. at 1508. Instead, Defendant Sunrise, through Personnel Director Hammontree, told Defendant Hankins that "we need to be careful" and that Defendant Hankins could not "kid about some things." *See* Deposition of Defendant Hankins at 84; Deposition of Personnel Director Hammontree at 11.

Additionally, Defendant Sunrise did not voluntarily monitor Defendant Hankins's future conduct towards subordinate employees. *Swentek,* 830 F.2d at 558. Finally, and most importantly, Defendant Sunrise did not actually stop Defendant Hankins from continuing to harass Plaintiff Kerr, Plaintiff Fowler and Plaintiff Mills.[20] *Steele,* 867 F.2d at 1316; *cf. Fuller v. City of Oakland,* 47 F.3d 1522, 1528–29 (9th Cir.1995) ("if no remedy is undertaken," or if "the remedy attempted is ineffectual, liability will attach").

 The Court is not suggesting that, in order to avoid liability for hostile work environment claims, employers have to closely monitor the day-to-day activities of every supervisor ever accused of sexual harassment. A strong, serious reprimand often will qualify as prompt remedial action, allowing the employer to avoid liability. In this particular case, however, Defendant Sunrise did not even give Defendant Hankins a strong, serious reprimand. The Court, therefore, concludes that a reasonable jury may find Defendant Sunrise failed to take prompt remedial action reasonably calculated to end Defendant Hankins's harassment of subordinate employees.

**20.** Defendant Hankins continued harassing Plaintiffs for approximately twenty months after Defendant Sunrise knew Defendant Hankins

 The Court's conclusion is not altered by Defendant Sunrise's claim that its "Open Door Policy" insulates it from liability. That policy required Plaintiffs to discuss their complaints with their immediate supervisor, before talking with anyone else. Plaintiffs' immediate supervisor was Defendant Hankins—the person who harassed and threatened them. The open door policy, therefore, does not insulate Defendant Sunrise from liability, because it is an ineffective grievance procedure. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72–73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986).

4. **Whether Summary Judgment Is Appropriate As To Plaintiffs' Claims That Defendant Sunrise Retaliated Against Them For Pursuing This Action**

On April 12, 1995, Defendant Sunrise issued written reprimands to Plaintiffs, because Plaintiffs allegedly were asking other Sunrise employees to talk with Plaintiffs' lawyers about Plaintiffs' case. These reprimands informed Plaintiffs that other employees felt intimidated and threatened by Plaintiffs and that "future violations ... of this nature [would] result in immediate discharge." Plaintiff Kerr's and Plaintiff Mills's reprimands were withdrawn and removed from their personnel files within twenty-four hours after they were issued. Plaintiff Fowler's reprimand was withdrawn and removed from her personnel file a little over one month after it was issued.

Plaintiffs claim these reprimands amounted to adverse employment action, designed to chill Plaintiffs' legal protests. Defendant Sunrise claims the reprimands were issued for a legitimate non-retaliatory reason—to stop Plaintiffs from intimidating Defendant Sunrise's other employees. Defendant Sunrise also claims Plaintiffs did not suffer an adverse employment action, because Plaintiffs' reprimands were withdrawn and removed from their personnel files.

 To establish a *prima facie* case of retaliation, Plaintiffs must establish three

could have a propensity to engage in sexual harassment.

elements: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir.1993). To establish a causal link, "a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated'" *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Id.* at 1163.

■ Once a plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Hairston,* 9 F.3d at 919. At the summary judgment stage, if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden then shifts back to the plaintiff to raise a genuine factual question as to whether the defendant's stated reason is "mere pretext." *Id.* at 920. Although a defendant's stated non-discriminatory reason could potentially overcome any inference of retaliation, summary judgment is ordinarily inappropriate once a *prima facie* case of retaliation has been established. *Id.* at 919–20.

### a. Whether the Subsequently Withdrawn Written Reprimands Qualify As An Adverse Employment Action

■ Although written reprimands do not always result in the loss of tangible job benefits, written reprimands make the future loss of tangible benefits more likely. Thus, written reprimands can be used to chill employees' statutorily, and constitutionally, protected speech. Given this, the Court believes that, as a general rule, a written reprimand may qualify as an adverse employment action.

In this case, however, Defendant Sunrise rescinded Plaintiffs' reprimands and removed them from Plaintiffs' personnel files. The Court, therefore, must decide whether the withdrawal of the reprimands removed the reprimands from the realm of adverse employment actions.

One court in the Eleventh Circuit has held that "a **nonthreatening** written reprimand, which is later removed from an employee's personnel file, is not an adverse employment action." *Coney v. Dep't of Human Resources of State of Georgia,* 787 F.Supp. 1434, 1442 (M.D.Ga.1992) (written reprimand, which was later rescinded, warned plaintiff that failure to carry out assigned duties would not be tolerated in the future) (emphasis added). Unlike the reprimand in *Coney,* Plaintiffs' reprimands were threatening. Plaintiffs' reprimands made it very clear that Plaintiffs would face immediate discharge if Plaintiffs "intimidated" other employees by talking with them about this suit.

■ The Court believes the threat of termination was impressed upon Plaintiffs by Defendant Sunrise, even though Plaintiffs' reprimands eventually were rescinded. Once an unmistakable threat of termination has been made by an employer, the withdrawal of the threat does not necessarily remove the chilling effect the threat has upon an employee's protected speech. For this reason, the Court concludes that, a **threatening** written reprimand, which is later removed from an employee's personnel file, may qualify as an adverse employment action, for purposes of a retaliation claim.

### b. Plaintiffs' Claims of Retaliation

■ The Court believes that, because Plaintiffs' protected expression and Defendant Sunrise's adverse action was not wholly unrelated, Plaintiffs have stated a *prima facie* claim of retaliation. The Court also believes Defendant Sunrise has stated a legitimate, non-discriminatory reason for its adverse action. "The instant record is not so one-sided," however, "as to be "deserving of summary judgment." *Hairston,* 9 F.3d at 920. This is especially true, given that Plaintiffs only have to show their protected expression was "a significant factor" in Defendant Sunrise's decision to reprimand Plaintiffs. *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1501 (11th Cir.1990).

At trial, Plaintiffs will have to prove Defendant Sunrise's stated reason for reprimanding Plaintiffs is merely a pretext for retaliation. The Plaintiffs may succeed by showing "[retaliation] more likely motivated [Defendant Sunrise] or indirectly by showing that [Defendant Sunrise's] proffered explanation is unworthy of credence." *Hairston,* 9 F.3d at 920. At this stage of the proceedings, however, Plaintiffs have carried their burden: "introducing evidence that could form the basis for a finding of facts, **which when taken in the light most favorable to the [Plaintiffs],** could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext, and that the [reprimands were issued] in retaliation for [Plaintiffs] engaging in the protected activity." *Id.* at 921 (emphasis added).

### E. Discussion Of Plaintiffs' State Law Claims

Plaintiffs have brought three state law claims against Defendant Sunrise: (1) intentional infliction of emotional distress; (2) battery; and (3) negligent retention. Defendant Sunrise has moved for summary judgment on all three claims.

### 1. Intentional Infliction Of Emotional Distress

Plaintiffs claim Defendant Sunrise intentionally inflicted severe emotional distress upon them by failing to stop Defendant Hankins from harassing them and by issuing Plaintiffs written reprimands for talking with other employees. Additionally, Plaintiffs argue that their claim for intentional infliction of emotional distress is based "primarily on the acts of sexual harassment" that they have experienced. Plaintiffs' Brief In Opposition To Defendant Sunrise's Motion For Summary Judgment at 64.

As to Plaintiffs' first argument, Plaintiffs have failed to introduce evidence showing Defendant Sunrise intended to inflict emotional distress upon Plaintiffs, by allowing Defendant Hankins to commit specific, known acts of sexual harassment. Thus, Plaintiffs first argument is nothing more than a restatement of Plaintiffs' claim for negligent retention.

To support their second argument, Plaintiffs cite *Yarbray v. Southern Bell Telephone & Telegraph Company,* 261 Ga. 703, 409 S.E.2d 835 (1991). In *Yarbray,* the plaintiff testified against her employer, after the employer's lawyer warned the plaintiff not to testify. To retaliate against the plaintiff, the employer allegedly transferred the plaintiff to a less desirable position, where the plaintiff was subjected to verbal abuse by her new supervisor. *Id.* at 704, 409 S.E.2d 835. Given these factual allegations, the *Yarbray* court concluded that a reasonable jury could find the employer intentionally inflicted emotional distress upon the employee. *Yarbray,* 261 Ga. at 706, 409 S.E.2d 835.

In the present case, Plaintiffs were not transferred, against their will, to less desirable positions. Additionally, once Plaintiffs Kerr and Mills were transferred, they were not verbally abused by new supervisors. Instead, Plaintiffs were **temporarily** issued reprimands that threatened to terminate Plaintiffs for "intimidating" other employees.

Given the temporary nature of these reprimands, and the factual distinctions between Plaintiffs' case and *Yarbray,* the Court concludes that Plaintiffs' second argument cannot support a claim for intentional infliction of emotional distress. The temporary issuance of Plaintiffs' written reprimands simply failed to rise to the level of outrageousness necessary to support a claim for intentional infliction of emotional distress. *Cf. Sossenko v. Michelin Tire Corp.,* 172 Ga.App. 771, 772–73, 324 S.E.2d 593 (1984) (advice and **warnings** to employee do not rise to requisite level of outrageousness to support claim for intentional infliction of emotional distress).

Finally, because Defendant Hankins intentionally engaged in acts of sexual harassment, Plaintiffs' third argument should be brought as a claim against Defendant Hankins; not as a claim against Defendant Sunrise.

For the reasons discussed above, the Court concludes that Defendant Sunrise's Motion For Summary Judgment should be granted as to the claims of intentional infliction of

emotional distress Plaintiffs have brought against Defendant Sunrise.

## 2. Battery

Plaintiffs claim Defendant Sunrise should be liable for Defendant Hankins's offensive touchings, because Defendant Sunrise allegedly ratified those touchings. Defendant Sunrise claims it should not be liable for Defendant Hankins's offensive touchings because: (1) Defendant Hankins was not acting within the scope of his employment when he touched Plaintiffs; and (2) Defendant Sunrise did not ratify Defendant Hankins's offensive touchings.

 The Court concludes that Defendant Hankins was not acting within the scope of his employment when Defendant Hankins tortiously touched Plaintiffs. Defendant Sunrise, therefore, cannot be liable for Plaintiffs' battery claims, under the theory of respondeat superior. *See B.C.B. Co. v. Troutman*, 200 Ga.App. 671, 672, 409 S.E.2d 218 (1991); *Favors v. Alco Mfg. Co.*, 186 Ga.App. 480, 482, 367 S.E.2d 328 (1988).

 Defendant Sunrise may be liable for Plaintiffs' battery claims, however, if, after Defendant Hankins touched Plaintiffs, Defendant Sunrise ratified the tortious touchings by failing to take corrective action against Defendant Hankins. *Cummings v. Walsh Constr. Co.*, 561 F.Supp. 872, 879–80 (S.D.Ga.1983); *Turner v. Joiner*, 77 Ga.App. 603, 618, 48 S.E.2d 907 (1948). Ratification occurs only where an employer has full knowledge of **the manner in which its employee committed an intentional tort.** *Turner*, 77 Ga.App. at 618, 48 S.E.2d 907.

 Plaintiffs have introduced no evidence showing Defendant Sunrise actually knew Defendant Hankins tortiously touched Plaintiffs Kerr[21] or Fowler.[22] Thus, the Court believes Defendant Sunrise's Motion For Summary Judgment is appropriate as to Plaintiff Kerr's and Plaintiff Fowler's battery claims. Summary judgment is not appropriate, however, for Plaintiff Mills's battery claim against Defendant Sunrise.

 Plaintiff Mills allegedly told Bobby Morrison, Defendant Sunrise's Plant Manager, that Defendant Hankins "liked to touch too much." Deposition of Plaintiff Mills at 46. Thus, Defendant Sunrise may have had actual knowledge that Defendant Hankins tortiously touched Plaintiff Mills. Despite this alleged knowledge, Defendant Sunrise took no timely action against Defendant Hankins to prevent any further touchings of Plaintiff Mills.[23] The Court, therefore, concludes that a reasonable jury could find Defendant Sunrise ratified Defendant Hankins's tortious touchings of Plaintiff Mills.

## 3. Negligent Retention

 Under Georgia law:

A cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment.

*Coleman v. Housing Authority of Americus*, 191 Ga.App. 166, 170, 381 S.E.2d 303 (1989) (citing *Cox v. Brazo*, 165 Ga.App. 888, 303 S.E.2d 71 (1983)).

 In other words, if an ordinarily careful employer, acting upon information furnished to it, reasonably could have discovered that its supervisor was sexually harassing its employees, the employer could be found to have negligently retained the supervisor. *B.C.B. Company, Inc. v. Troutman*, 200 Ga. App. 671, 673, 409 S.E.2d 218 (1991); *Coleman*, 191 Ga.App. at 170, 381 S.E.2d 303.

---

**21.** Plaintiff Kerr only told Defendant Sunrise that Defendant Hankins was saying inappropriate things to her. Until this suit, Plaintiff Kerr never informed Defendant Sunrise that Defendant Hankins rubbed his genitals against her back. Thus, Defendant Sunrise could not have ratified Defendant Hankins's touching of Plaintiff Kerr.

**22.** Even if Defendant Sunrise had constructive knowledge that Defendant Hankins was tortiously touching Plaintiff Fowler, constructive knowledge will not support a claim of ratification.

**23.** Assuming that Plaintiff Mills's transfer qualifies as effective remedial action, that transfer did not happen right away.

In *Troutman,* a female employee was sexually harassed by her male supervisor. The employee reported the harassment to her employer. After discussing the employee's complaint with the harassing supervisor, the employer simply transferred the employee to a new department. The employer then hired the plaintiff to replace the transferred employee. The supervisor sexually harassed the plaintiff, just as he had harassed the plaintiff's predecessor. *Id.* at 672–73, 409 S.E.2d 218. These facts led the *Troutman* court to conclude that the employer's motion for summary judgment was inappropriate as to the plaintiff's negligent retention claim.

■ Given the law as stated by *Coleman,* and the similarity of the present case to *Troutman,* the Court believes a reasonable jury could find Defendant Sunrise negligently retained Defendant Hankins, despite Defendant Sunrise's knowledge that Defendant Hankins had a propensity to engage in sexual harassment. The Court, therefore, concludes that Defendant Sunrise's Motion For Summary Judgment is inappropriate as to Plaintiffs' claims of negligent retention.

## III. Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant Sunrise's Motion For Waiver of Page Limitation [23] and **GRANTS IN PART AND DENIES IN PART** Defendant Sunrise's Motion For Summary Judgment.

ORDERED.