**Angela C. MORROW, Plaintiff,**

v.

**AUBURN UNIVERSITY AT MONTGOMERY and Dr. Thomas Denton, Defendants.**

**Civil Action No. 96–C–273–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 18, 1997.

James Mendelsohn, Amy W. Sinnott, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Angela C. Morrow.

Leslie McCafferty Allen, David R. Boyd, Balch & Bingham, Montgomery, AL, Lee F. Armstrong, Auburn University, AL, for Auburn University at Montgomery.

Henry Clay Barnett, Jr., Christopher W. Weller, Capell, Howard, Knabe & Cobbs, P.A., Montgomery, AL, for Thomas Denton, Dr.

### MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

Plaintiff, Angela Morrow, commenced this action against Auburn University at Montgomery ("AUM") and Thomas Denton, Ph.D. alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and state law claims for assault, business tort and ·fraud. Plaintiff alleges that she was subjected to adverse employment decisions and a hostile work environment because of her gender and in retaliation for complaining about the harass-

ment that she suffered. Specifically, plaintiff contends that she was denied promotion and appointment to a tenured position at AUM and was subjected to offensive and unprofessional treatment by defendant Denton.[1] Plaintiff seeks compensatory and punitive damages, and injunctive and declaratory relief.

■ Defendants AUM and Denton moved for summary judgment on February 18, 1997. After several requests from the parties for extensions of time and leave to supplement the record, the motions were set for submission on June 29, 1997.[2] For the reasons state below, the court finds that the motions are due to be granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiff joined the faculty at AUM as a part-time instructor in the Biology Department in September, 1979. She continued to serve in that position until the end of the 1981–82 academic year. Plaintiff then left AUM to teach at a high school. Plaintiff had applied for an advertised position for full time instructor of Biology at AUM on May 5, 1982 but later withdrew from the process.[3]

Plaintiff returned to AUM as a part-time biology instructor for the 1984 Winter Quarter.[4] Defendant Denton became the head of AUM's Biology Department in 1987 and was plaintiff's supervisor when she was appointed as a full time temporary instructor for the 1989–1990 academic year in August, 1989.[5] In December, 1990, plaintiff signed a Notice of Acceptance of Appointment for her full time temporary instructor position.[6] Among the provisions in the notice is the following:

Faculty with the rank of "Instructor" are expected to demonstrate their qualifications for promotion within three to five years of service. Instructors are not eligible for tenure, and all persons at this rank are appointed on a Temporary basis.

While teaching at AUM plaintiff also participated in a number of research and writing projects with professors in the Biology Department. In 1991, plaintiff accepted the duties of coordinator of Biology 101 in addition to her teaching responsibilities. Plaintiff also began pursuing her doctorate in 1992 at Auburn University while she continued her full time duties as an instructor. Plaintiff avers that the only reason she began her doctoral studies was because Denton informed her that in order to be considered for tenure she at least had to be working on her terminal degree.[7] Plaintiff also alleges that she later asked Denton what she needed to do to prepare for tenure and his response was that she only needed to apply.[8]

In October, 1993, plaintiff met with the Dean of the School of Sciences, Joseph Hill,

---

1. Plaintiff filed her original complaint on February 20, 1996, while she was still employed at AUM. On May 29, 1996, with leave of the court, plaintiff filed an amended complaint which further specified her allegations related to her denial of tenure claim and added allegations regarding the discontinuation of her employment and denial of appointment to other positions.

2. Without leave of the court, on July 8, 1997, AUM filed "Additional Authority in Support of Auburn University's Motion for Summary Judgment" citing *Holifield v. Reno*, 115 F.3d 1555 (11th Cir.1997) and *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir.1997) in support of its motion. Since this submission is not timely, the court will not consider the arguments presented. However, since the court is bound by any relevant case law that is issued at the time that it renders a decision on a pending motion, the court is not precluded from considering the authorities cited.

3. Deposition Testimony of Angela Morrow at 80, 89–90, 218.

4. Deposition Testimony of Angela Morrow, Defendant's Exhibit 11, Memorandum of Understanding.

5. Deposition Testimony of Angela Morrow, Defendant's Exhibit 14; Plaintiff's Exhibit 11. See also Plaintiff's Exhibit 15, August 18, 1989 Memo to Professorial Staff requesting permission to hire plaintiff as a temporary instructor.

6. Deposition Testimony of Angela Morrow, Defendant's Exhibit 16.

7. Affidavit of Angela Morrow at ¶¶ 9–12. See also Deposition Testimony of Angela Morrow at 99–101.

8. Affidavit of Angela Morrow at ¶ 17; Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24, "Background information on work experience of Angela C. Morrow at Auburn University at Montgomery" and "Work File—Angela C. Morrow/Auburn University at Montgomery," respectively.

for an informal discussion about applying for tenure.[9] According to plaintiff, at that time she learned that she was classified as a temporary employee and that in that classification she was not eligible for promotion or tenure.[10] Plaintiff had not received another letter of contract or notice of appointment since she became a full time temporary instructor in 1989. Sometime after her meeting with Hill, Denton spoke to plaintiff about her pursuing tenure. Plaintiff describes Denton as being aggravated and chastising because she discussed the matter with Hill.[11] Plaintiff also maintains that at that time Denton offered vague criticism about her work and advised her that she needed to work on her charm "as only [she] could do" with her colleagues, and that if she did not get tenure she would not have a problem finding another job with her Ph.D. and waistline.[12] Denton maintains that he merely informed plaintiff that her rapport with the faculty and students was diminishing and that she needed to work on this.[13] Denton also denies that he made any comment about plaintiff's figure and states that he merely pointed out that having a Ph.D. would be an advantage to obtaining a job at any university.[14]

Plaintiff also contends that Denton continued to make comments about her figure and weight loss in the Spring of 1994. There was an incident that plaintiff refers to as "playing footsie" that occurred in the hallway in front of two other professors.[15] Denton attempted to step on plaintiff's "little white tennis shoes." One of the professors present described the incident as "cutesy," like a parent teasing a child.[16] Plaintiff says that the situation made her uncomfortable and was so disconcerting that she discussed the matter with Hill.[17]

Hill met with plaintiff on April 26, 1994. During that meeting plaintiff discussed her frustration about the tenure process, whether she would be retained for the following school year and Denton's harassing behavior toward her.[18] According to plaintiff, Hill advised her that she was not the only person to complain about inappropriate behavior by Denton.[19] While Hill confirms that plaintiff discussed her harassment problem with him, Hill denies that he told plaintiff that he had received complaints from other women about Denton. Hill advised plaintiff that her allegation was serious and she should file a formal charge with the EEO Officer. Hill did speak to Denton, as he told plaintiff he would, and advised Denton that he needed to be more cognizant of his conduct toward plaintiff and that AUM did not and would not tolerate any harassment of its staff members.[20] In response to an inquiry conducted by AUM's EEO Officer later in the year, Denton did not recall the incident.[21]

In May, 1994, Denton polled the professorial faculty in the Biology Department for a

9. Deposition Testimony of Joseph Hill at 62–64, 72; Deposition Testimony of Angela Morrow at 216.

10. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24.

11. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24.

12. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24. In the exhibits plaintiff states that this meeting took place in November, 1994. Given the chronology of other events referred to in plaintiff's statement, the court believes that the year should be 1993. See Deposition Testimony of Angela Morrow at 12, Defendant's Exhibit 47.

13. Deposition Testimony of Thomas Denton at 59–60, 78–79.

14. Deposition Testimony of Thomas Denton at 60, 151–152.

15. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24. See also Affidavit of Rose Shook, Exhibit B at Bates Number 870, 880.

16. Affidavit of Rose Shook, Exhibit B at 875.

17. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24.

18. Affidavit of Angela Morrow at ¶¶ 20 & 23; Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24.

19. Affidavit of Angela Morrow at ¶ 24.

20. Deposition Testimony of Joseph Hill at 87. See also Affidavit of Rose Shook, Exhibit B at 878.

21. Deposition of Thomas Denton at 154.

statement on appointing plaintiff to probationary status, the first step to put her on the tenure track.[22] Two faculty members recommended placing plaintiff on probationary status, six voted against changing plaintiff's status. One faculty member did not respond. Among those who did not support changing plaintiff's status a prevalent concern was that the manner in which plaintiff was hired did not follow appropriate procedures, particularly, that the appointment that she received in 1989 was not pursuant to an advertised national search.[23] Only one colleague made a negative comment about plaintiff's teaching performance. Denton advised Hill of the results of the faculty poll and recommended that she remain at AUM as a temporary biology instructor for the 1994–95 school year instead of being converted to probationary status.[24] On July 15, 1994, plaintiff was notified that she would maintain her position as a full time temporary instructor for the 1994–95 school year.[25] When plaintiff questioned Hill about why she was not given probationary status he informed her that he was unable to give her any further information. Plaintiff did not receive the faculty polling statements. At that time plaintiff also requested information about her employment status for the 1995–96 academic year. Hill advised her that he felt that she would be employed for that year and that she would be notified formally in November 1994.[26] Plaintiff was notified in October, 1994, that she would be contracted as a Temporary Instructor for Biology for the 1995–96 school year.[27] This offer was confirmed by Hill in May, 1995. At that time, Hill also advised plaintiff that her appointment would remain as temporary instructor and that an appointment for the 1995–1996 academic year would be the final year of her appointment because at that time she would have reached the maximum period allowable that she could serve at AUM.[28]

After being advised that her status would not be changed to probationary, plaintiff met with the president of the Auburn University Chapter of the American Association of University Professors (hereinafter referred to as "AAUP"), Josef Renden, in August, 1994, to discuss the circumstances related to her attaining tenure and being harassed by Denton.[29] On October 13, 1994, plaintiff advised Bruce Gordon, Co–Chair of AUM's Faculty Grievance Committee that she was filing a formal grievance against Denton. Plaintiff's complaint charged the following:

> . . . Dr. Denton is guilty of unfair and wrong [sic] use of procedures in matters concerning nonrenewal of appointments and nomination for tenure and promotion, administrative mishandling of performance evaluations and other working conditions, and improper and unethical activities, including without limitation, misrepresentation of material fact, fraud, deceit, suppression of material fact, failure to honor commitments, sexual discrimination, and harassment.[30]

A grievance hearing was scheduled for January 6, 1996. After conferring with counsel, however, plaintiff decided not to proceed with the grievance hearing.[31]

22. Deposition Testimony of Angela Morrow, Defendant's Exhibit 17; Plaintiff's Exhibit 20. See also Plaintiff's Exhibit 21, May 4, 1994 memo approving polling of faculty to convert plaintiff's status to probationary.

23. Affidavit of Joseph Hill, Exhibit A; Plaintiff's Exhibits 17–19.

24. Affidavit of Joseph Hill, Exhibit B; Plaintiff's Exhibit 30.

25. Deposition Testimony of Angela Morrow, Defendant's Exhibit 19; Deposition Testimony of Joseph Hill, Plaintiff's Exhibit 2; Affidavit· of Joseph Hill, Exhibit C; Plaintiff's Exhibit 28.

26. Deposition Testimony of Angela Morrow, Defendant's Exhibit 23 & 24.

27. Deposition Testimony of Angela Morrow at 25, Defendant's Exhibit 47.

28. Deposition Testimony of Angela Morrow, Defendant's Exhibit 62. See also Deposition Testimony of Angela Morrow, Defendant's Exhibit 24.

29. See Deposition Testimony of Angela Morrow, Defendant's Exhibit 39 & 41.

30. Deposition Testimony of Angela Morrow, Defendant's Exhibit 47, Complaint.

31. Deposition Testimony of Angela Morrow, Defendant's Exhibit 54.

Plaintiff also had filed a formal complaint of sexual harassment against Denton with the AUM's EEO officer Rose Shook on November 11, 1994.[32] Shook's investigation of plaintiff's charges included interviewing plaintiff, Denton, all of the female employees in the Biology Department, Professors Susan Thomson and John Aho, the two faculty members present during the "footsie" incident, and Hill.[33] On December 8, 1994, Shook advised plaintiff that she did not find any violation of AUM's nondiscrimination policies.[34]

In March, 1996, plaintiff applied for two advertised appointments in the Biology Department.[35] One position was a temporary Assistant Professor or Instructor appointment. The other position was an Assistant Professor tenure track appointment.[36] Although two positions were advertised only the tenure track Assistant Professor position was filled.[37] Plaintiff had not been selected for an interview for that position. Plaintiff continued her employment at AUM as a temporary full time instructor through June 15, 1996. She is no longer affiliated with AUM.

## II. MOTIONS FOR SUMMARY JUDGMENT

AUM argues that plaintiff's Title VII claims should be dismissed because plaintiff failed to timely file her EEOC charge. AUM further contends that plaintiff's causes of action should be dismissed because plaintiff cannot state a claim. Defendant Denton also argues that the state law claims against him alleging assault, business tort and fraud should be dismissed because these claims were not timely commenced and plaintiff fails to state a claim upon which relief can be granted. The court will examine each of these arguments in turn.

### A. Timeliness of Title VII Claim

■ When a plaintiff commences a lawsuit under Title VII of the Civil Rights Act, the complaint must allege that all conditions precedent to the commencement of the lawsuit have been satisfied. *Fed.R.Civ.P.* 9(c); *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1010 (11th Cir.1982). If a defendant specifically denies that the plaintiff has satisfied a requisite precondition, the plaintiff has the burden of proving her compliance.

■ Title VII requires a plaintiff to file a charge with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e)(1). *See also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). To determine whether a charge was timely filed, the court must determine what adverse employment decision is at issue and when it occurred. *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 797 (11th Cir. 1992).

Morrow filed a charge with the EEOC on January 3, 1995, alleging that "[a]s a result of discriminatory and harassing treatment, I have been denied the same opportunity to seek and attain tenure, and to work in an environment free from gender harassment, as is enjoyed by similarly situated males."[38] AUM argues that plaintiff's claim regarding denial of tenure was not timely because the EEOC charge was not filed within 180 days after October 1993, when plaintiff reasonably should have known that she would not be considered for tenure. In support of this argument, AUM proffers that since plaintiff was informed at that time that she did not have probationary status, which is required for a faculty member to attain tenure, plaintiff should have filed a charge concerning the denial of tenure within 180 days of that occurrence. Additionally, AUM argues that since plaintiff was notified by Hill on April 26, 1994, that the faculty would have to be polled before her status could be changed to

---

**32.** Deposition Testimony of Angela Morrow, Defendant's Exhibit 55; Affidavit of Rose Shook, Exhibit B.

**33.** Affidavit of Rose Shook, Exhibit B at Bates Number 867–880.

**34.** Deposition Testimony of Angela Morrow, Defendant's Exhibit 58; Affidavit of Rose Shook, Exhibit B at Bates Number 866.

**35.** Deposition Testimony of Angela Morrow, Defendant's Exhibit 18.

**36.** Affidavit of Joseph Hill, Exhibit D.

**37.** Affidavit of Joseph Hill, Exhibit E.

**38.** Deposition Testimony of Angela Morrow, Defendant's Exhibit 59; Plaintiff's Exhibit 26.

probationary, she certainly should have filed an EEOC charge within 180 days of that date.

■ Plaintiff argues that the relevant date for her denial of tenure claim is July 15, 1994, when plaintiff was advised by Denton that would continue in the 1994–95 academic year as a temporary instructor, and, therefore, was denied probationary status.[39] The court agrees with plaintiff that the limitations period for filing an EEOC charge related to plaintiff's denial of tenure commenced July 15, 1994, the date when plaintiff was formally notified that she would continue as a temporary instructor which consequentially meant that she would not be considered for tenure. *See Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). To accept AUM's argument, that the limitations period for this charge commenced when plaintiff was informed that she had temporary status, which was in October, 1994, or alternatively, on April 26, 1994, when plaintiff was informed that the faculty would have to be polled regarding a change in her status, would require plaintiff to file a charge prematurely based only on suspicion of a prospective adverse employment decision. The relevant inquiry for determining whether an EEOC charge was timely charged is in relation to the alleged discriminatory *act,* not when the plaintiff became aware that she was required to participate in a process that may have an adverse employment outcome because of her gender.[40] Since plaintiff filed an EEOC charge challenging AUM's decision to her tenure within 180 days of July 15, 1994, when she was formally advised that her status would continue as temporary, her claim relating to denial of tenure is timely.

AUM also argues that any portion of plaintiff's sexual harassment claim that relies on any offensive conduct that occurred more than 180 days before plaintiff filed her EEOC charge should be dismissed as untimely. Therefore, AUM argues, plaintiff's sexual harassment claim should be limited to conduct that occurred after July 7, 1994.

■ While a plaintiff may pursue a civil action under Title VII only for claims that were raised in a timely EEOC charge, conduct that occurred outside that the statutory limitations period may be actionable if that conduct is part of a pattern of discrimination related to the conduct alleged in the EEOC charge. Under this theory of "continuing violation," conduct that occurred outside the 180 days limitation period will be deemed actionable if the conduct is substantially similar and of an on-going nature. *See Beavers,* 975 F.2d at 797–798; *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 800–801 (11th Cir.), *modified on other grounds,* 850 F.2d 1549 (11th Cir.1988). The continuing violation theory is particularly applicable to hostile work environment claims because such claims are not based on discreet acts but are supported by plaintiff establishing an ongoing pattern of offensive conduct. *Patterson v. Augat Wiring Sys., Inc.,* 944 F.Supp. 1509, 1517 (M.D.Ala.1996). *See also Quillen v. American Tobacco Co.,* 874 F.Supp. 1285, 1292 (M.D.Ala.1995); *Saville v. Houston County Healthcare Auth.,* 852 F.Supp. 1512, 1522 (M.D.Ala.1994).

■ Plaintiff's allegation in this action is that Denton engaged in an ongoing practice of referring to her in diminutive and demeaning terms and compromising her professional status. If this allegation states a claim of sexual harassment it is because of the pattern and continuing nature of the complained of conduct. Accordingly, plaintiff's sexual harassment complaint should not be limited to conduct that occurred within 180 days of plaintiff filing an EEOC charge. AUM's attempt to limit plaintiff's allegation of sexual harassment to conduct that occurred after July 7, 1994 is without merit.

---

**39.** Deposition Testimony of Angela Morrow, Defendant's Exhibit 19; Affidavit of Joseph Hill, Exhibit C; Plaintiff's Exhibit 28.

**40.** Ironically, AUM's contention that plaintiff should have known that she would not attain tenure when she was advised that the faculty needed to be poll implies that the polling process was in fact a facade for a foregone conclusion that plaintiff would not receive due consideration or that the polling process itself was discriminatory. Certainly, AUM would not concede either of the latter.

## B. Failure to State a Claim

 To prevail on motion for summary judgment for failure to state a claim, defendants must affirmatively negate an essential element of plaintiff's claim, or demonstrate that plaintiff's evidence is insufficient to establish an essential element of her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Wu v. Thomas,* 847 F.2d 1480, 1484 (11th Cir.1988). Conversely, to survive a motion for summary judgment, plaintiff's initial burden is to present evidence demonstrating that she can establish the basic elements of her claim. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. In the context of an employment discrimination action, a plaintiff establishes the basic elements of her claim by presenting a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Additionally, since the ultimate element of proof in an employment discrimination action is whether defendants acted with discriminatory intent, *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403 (1983), a plaintiff also must present evidence that defendant's conduct was motivated by gender animus. *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996). This burden is satisfied if the plaintiff introduces evidence that the employer's proffered reason for the challenged employment decision is not worthy of belief. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749–2750, 125 L.Ed.2d 407 (1993); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 921 (11th Cir.1994). Since this ultimate issue, whether defendants acted with discriminatory motive or intent, can be an "elusive factual question," and the court must avoid weighing conflicting evidence and making credibility determinations, summary judgment is generally inappropriate unless the inference of discrimination is totally lacking. *Hairston,* 9 F.3d at 921; *see also Batey v. Stone,* 24 F.3d 1330, 1335–1336 (11th Cir.1994).

### 1. Sexual Harassment

 Sexual harassment in workplace occurs when an employee is subjected to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. 29 C.F.R. § 1604.11. There are two legal theories available for a plaintiff alleging that she was subjected to sexual harassment: (1) *"quid pro quo"* harassment which occurs when an employer alters an employee's job conditions, privileges or benefits because she refuses to submit to sexual demands; and (2) *"hostile work environment"* harassment which occurs when the employee is subjected to conduct that has the purpose or effect of unreasonably interfering with her work performance or creating an intimidating, hostile or offensive work environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–2405, 91 L.Ed.2d 49 (1986). In this action, plaintiff's sexual harassment claim is based on *quid pro quo* harassment and hostile work environment. AUM argues that plaintiff cannot establish a prima facie case of sexual harassment under either theory.

#### a) *Quid pro quo* Sexual Harassment

 A cause of action for *quid pro quo* sexual harassment exists if an employer alters an employee's job condition as a result of the employee's refusal to submit to sexual demands. *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–2405; *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir.1989). In order to establish a claim of *quid pro quo* harassment a plaintiff must show (1) that she belongs to a protected group, (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment complained of was based on sex, and (4) that her reaction to the harassment affected tangible aspects of her compensation, or terms, conditions or privileges of employment. *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982).

 AUM argues that plaintiff's *quid pro quo* sexual harassment claim must fail because plaintiff cannot show that obtaining any job benefit or avoiding any detriment was condition upon her compliance with sexual considerations because plaintiff admits that Denton did not subject her to sexual advances. Plaintiff argues that she states a claim for *quid pro quo* sexual harassment because the evidence demonstrates that Den-

ton conditioned her continued employment on her acquiescence to his possessive, demeaning actions and remarks related to sex. To support a claim for *quid pro quo* harassment it is essential that the plaintiff show a nexus between the harassing conduct and a job related reprisal. *Johnson v. Wal–Mart Stores, Inc.,* Civil Action No. 95–D–1645 (M.D.Ala. July 7, 1997); *Sneed v. Montgomery Hous. Auth.,* 956 F.Supp. 982, 986 n. 3 (M.D.Ala.1997). *See, e.g., Henson,* 682 F.2d 897 (male supervisor conditioned his recommendation for plaintiff to attend policy academy upon her having sexual relations with him). While the alleged harasser's request or offensive conduct does not need to be specifically and expressly intertwined with a job benefit or detriment, there should be a reasonable "verbal/temporal" relationship between the offensive request or conduct and discussion of the employee's job benefit or detriment. *Fowler v. Sunrise Carpet Indust., Inc.,* 911 F.Supp. 1560, 1578 (N.D.Ga.1996)(*relying on Nichols v. Frank,* 42 F.3d 503, 512–513 (9th Cir.1994)).

 In the pending action, the court finds that there is not a sufficient nexus between the complained of conduct and the alleged adverse employment decisions that affected plaintiff. Additionally, the court finds that the conduct plaintiff complains about is not sufficiently offensive to be actionable as a *quid pro quo* harassment claim.[41] Therefore, plaintiff cannot establish a claim of sexual harassment based upon the theory of *quid pro quo* harassment.

### b) Hostile Work Environment Sexual Harassment

 To support a hostile work environment claim, the plaintiff must show that she was subjected to sexual harassment that was "sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive work environment.'" *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (*quot-*

*ing Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). It is not enough for the plaintiff to show that her workplace is offensive; she must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. at 2405, such that a reasonable person would perceive the environment as hostile or abusive. *Id.* at 67, 106 S.Ct. at 2405–2406; *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). To determine whether a hostile environment is severe enough to be actionable under Title VII, the "totality of the circumstances" must be considered, not only the frequency of the incidents alleged but the gravity of the incidents should be evaluated. *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir.1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

 In this action, plaintiff alleges that her work environment was hostile because of Denton's demeaning and condescending references and conduct toward her. Specifically, plaintiff complains that sometime in 1989 Denton patted her on her rear with a ruler "in public;" in the 1993 Spring semester and April 26, 1994 Denton put his arm around her shoulder and rubbed the back of her neck in front of the students in her lab; in October 1994 Denton intentionally stood close behind her in "a rude fashion" when she was standing in front of an office supply closet; in February or March 1994 Denton attempted, teasingly, to soil her shoes in front of one of her colleagues; Denton referred to her in diminutive terms such as "teeny bopper" "little scientist" and "warm lady" in front of her colleagues and students and often made comments about her figure including a few years before 1994 questioning how she lost weight and regained her figure

---

**41.** The court is aware that a blatant request for sexual favors is not necessary to establish a claim of *quid pro quo* harassment. However, it is necessary that the complained of conduct has a sexual connotation. *See Fowler,* 911 F.Supp. 1560 (supervisor's inquiries about plaintiff's sexual activities as well as conversing about his own constituted sexual advances); *Bridges v. Eastman Kodak Co.,* 885 F.Supp. 495 (S.D.N.Y.1995)(supervisor's use of foul language, sexual innuendo, referring to women in derogatory terms and criticizing women in terms of their sexuality was actionable under a *quid pro quo* harassment claim). The conduct that plaintiff complains of in this action simply does not constitute a form of sexual misconduct that is actionable as a *quid pro quo* claim.

after a pregnancy; and counseled plaintiff to "work her charms" and be "everybody's little darling" to get support for tenure among her colleagues.[42] According to plaintiff, after November 1993, Denton purposely tried to embarrass her and make her feel uncomfortable.

■■■ The court agrees with plaintiff that such conduct is unprofessional and disrespectful.[43] The court also agrees that it is a reasonable inference that Denton would not have treated a male faculty member in such a "possessive fatherly" manner. However, to establish an actionable hostile work environment claim, the plaintiff must show that the offender's conduct was *hostile or abusive harassment* which was sufficiently *pervasive* and severe, *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987); therefore, conduct that is merely objectionable or compromising in not necessarily actionable. *See Harris*, 510 U.S. at 21, 23, 114 S.Ct. at 371; *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)(A mere utterance which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.)[44] Denton's comments about plaintiff's dress, figure and petiteness, while inappropriate, were not sexually suggestive. *Cf. Steele*, 867 F.2d at 1313, 1316. Additionally, even as plaintiff describes the "touching" incidents, the court cannot find that such conduct was physically threatening or lewd and obscene. *See e.g., Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir.1988). Denton's conduct toward plaintiff was unwelcomed and fatuous, but not was not sufficiently severe and pervasive to be actionable under Title VII. *See Stoeckel v. Environmental Management Sys., Inc.*, 882 F.Supp. 1106 (D.D.C. 1995) (colleague commenting about plaintiff's appearance and clothes, directing her through the office by holding her hand, rubbing her shoulder and neck and positioning himself as though he was going to kiss plaintiff in the elevator, all of which occurred over a four month period, did not rise to level of pervasiveness and severity to constitute a hostile work environment).

Since plaintiff has not shown that she was subjected to *quid pro quo* harassment or a hostile work environment, Auburn University is entitled to summary judgment in its favor on plaintiff's sexual harassment claim.

### 2. Disparate Treatment

Title VII deems it unlawful for an employer to discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's gender. *See* 42 U.S.C. § 2000e-2(a)(1). Plaintiff alleges that she was subjected to disparate treatment because, unlike similarly situated male colleagues, she was subjected to faculty polling before being considered for tenure and was required to have a terminal degree before being granted tenure.

The ultimate issue in a gender discrimination claim is whether the defendant intentionally discriminated against plaintiff because of her gender. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481–1482. Since direct evidence of discriminatory animus can be difficult to produce, a plaintiff often must rely on circumstantial evidence to support her claim of disparate treatment. In evaluating this circumstantial evidence, the court is guided by the three step procedure enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Under the *McDonnell Douglas–Burdine* analysis, the court first considers whether the plaintiff presents a prima facie case of discrimination. *Burdine*, 450 U.S. at 253–254, 101 S.Ct. at 1093–1094; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. To establish a prima facie case of disparate

---

**42.** Affidavit of Angela Morrow at ¶¶ 21–22; Plaintiff's Response in Opposition to Auburn University's Motion for Summary Judgment filed April 4, 1997 at 7.

**43.** The court recognizes that Denton either denies that some of these incidents occurred or denies that they occurred as plaintiff represents. However, since this matter is before the court on defendants' motions for summary judgment, any factual inferences must be in plaintiff's favor. *See infra* II.B.

**44.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

treatment based on gender discrimination the plaintiff must show (1) that she is a member of a protected class; (2) that she was qualified and applied for the promotion sought; (3) that, despite her qualifications, she was rejected; and (4) that other employees with equal or less qualifications who are not members of the same protected class as plaintiff were promoted. *Wu,* 847 F.2d at 1483 (applying *McDonnell Douglas* prima facie elements to challenge promotion decisions). By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated against her. *Burdine,* 450 U.S at 254, 101 S.Ct. at 1094. This presumption arises because the prima facie case eliminates the most common nondiscriminatory reasons for rejecting an applicant: lack of qualifications and lack of an available job. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977).

If the plaintiff succeeds in presenting a prima facie case, the burden then shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the plaintiff's rejection. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The employer's burden is one of production rather than persuasion. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

The plaintiff, however, may challenge the employer's proffered the non-discriminatory reason as pretextual, that is, "unworthy of credence," *McDonnell Douglas,* 411 U.S. at 803–804, 93 S.Ct. at 1824–1825, or she may present evidence to show that "a discriminatory reason more likely motivated the employer." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. At this point, a plaintiff avoids summary judgment "by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party [the plaintiff employee], could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext," and that the employment action taken was based on discriminatory motives. *Hairston,* 9 F.3d at

921. Since the ultimate issue, whether defendants acted with discriminatory motive or intent, can be an "elusive factual question," summary judgment is generally inappropriate unless the inference of discrimination is totally lacking. *Id. See also Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987).

■ AUM argues that plaintiff cannot establish a prima facie case of disparate treatment because she did not have the qualifications for a tenure position, and she was not treated differently than a similarly situated male faculty member. Specifically, AUM contends that plaintiff could not have attained tenure because she did not have the appropriate status since she was not probationary and she did not hold a terminal degree for her field. Plaintiff argues that AUM cannot argue in this action that plaintiff was not qualified for a tenured position since she did not have probationary because one of plaintiff's contentions is that she was denied probationary status because of the illegitimate polling procedure used to prevent her from attaining probationary status. At the onset, the court notes that AUM's procedures for promotion, which a status change from temporary to probationary would be,[45] provides for polling the faculty for a recommendation on the promotion. See Faculty Handbook Auburn University at Montgomery (1987), III.A.4.b. at III.4–5. Therefore, the issue the court must address in this action is whether this polling process was applied consistently without regard for gender. Plaintiff contends that it was not. Plaintiff alleges that another faculty member in her department, Jeffrey Barksdale was granted tenure without being subjected to polling to change his status to probationary. AUM contends that polling was not necessary to change Barksdale's status because he always had a probationary appointment. In support of this contention AUM relies on Barksdale's deposition testimony wherein he states that he believed his position at the time of hire was a tenure track appointment.[46] However, Barksdale's letter

---

**45.** See Faculty Handbook Auburn University at Montgomery (1987), III.A Kinds of Appointment at III.1. Since Instructors cannot be given probationary status, plaintiff would have had to be promoted to assistant professor in order to attain such status.

**46.** Defendant's Exhibit 2, Deposition Testimony of Jeffrey Barksdale Vol. II at 14:

of offer is for the position of "Instructor." [47] Additionally, Barksdale's notice and acceptance identifies the position of appointment as "Instructor." [48] While the notice and acceptance of appointment also states that Barksdale's appointment as Instructor is probationary, it also provides that faculty with the rank of Instructor are appointed in the Temporary category. The court does not need to resolve this inherent contradiction in Barksdale's notice and acceptance of appointment. The relevant issue that is demonstrated by Barksdale's appointment procedure is that although he was within the same department as plaintiff he was treated differently either by being granted an appointment as a probationary instructor, or being promoted to assistant professor, a probationary status position, and attaining tenure without being subjected to separate faculty polling for the assistant professor appointment.[49] Thus, given this differential application of the polling procedure for Barksdale and plaintiff, the court cannot find that plaintiff's appointment as temporary deemed her unqualified for attaining tenure.

Plaintiff further demonstrates that she was treated differently than Barksdale because he was permitted to attain tenure without obtaining a terminal degree in his field. Among the considerations for promotion to Assistant Professor identified in the Faculty Handbook is the that the candidate should have completed a terminal degree. See Faculty Handbook Section

III.B.1.b. at III.2. AUM argues that a master's degree, which Barksdale held was the highest degree in Barksdale's discipline since he was in the medical technology field. In the Faculty Handbook, however, the doctorate is identified as the terminal degree for most disciplines except areas such as studio arts and certain performing arts. There is no exception noted for medical technology. AUM's contention that a master's degree is the terminal degree in the medical technology field is further undermined by the fact that in recommending Barksdale for tenure Denton noted "Jeff realizes the need to have a doctoral degree and has been accepted into a graduate program to work toward a Ph.D. in the School of Pharmacology at Auburn's main campus." Deposition Testimony of Denton, Plaintiff's Exhibit 1. This evidence raises a triable issue of material fact whether a doctorate is the terminal degree for Barksdale field [50] and, more important, whether Barksdale was appointed to Assistant Professor and attained tenure without obtaining a terminal degree, although this requirement was imposed on plaintiff.

Since plaintiff and Barksdale were faculty members in the same department and sought promotion and tenure in accordance with procedures that were applicable to both, and the time that each applied for promotion and tenure is reasonably related, the court finds that they are similarly situated. The evidence demonstrates, however, that these individuals were not treated the same when they were considered for promotion and ten-

Q. You agree that letter does not say anything about tenure track?
A. I didn't see it in the letter.
Q. What was the basis of your understanding when you were hired that you understood you were on tenure track?
A. I believe the description in the journal that I applied from indicated it was a tenure-track position, and I believe I discussed this with someone, possibly several people during the interview process.

**47.** Defendant's Exhibit 2, Deposition Testimony of Jeffrey Barksdale, Plaintiff's Exhibit 1.

**48.** Defendant's Exhibit 2, Deposition Testimony of Jeffrey Barksdale, Plaintiff's Exhibit 2; See also Plaintiff's Exhibit 24.

**49.** In his deposition, Barksdale testified that his promotion to Assistant Professor and attainment of tenure was simultaneous. Deposition Testi-

mony of Jeffrey Barksdale, Vol. II at 19. According to the procedures in the faculty handbook, an Instructor must be promoted or approved for promotion to the rank of Assistant Professor to be eligible for tenure. See Faculty Handbook Section III.B.5.a. at III.6. There is no evidence before the court that Barksdale was ever subject to a polling process to change his appointment from Instructor to Assistant Professor. Arguably, this is further evidence of differential treatment since AUM permitted simultaneous change in rank with attainment of tenure for Barksdale, the same procedure could have been available for plaintiff.

**50.** It also is noteworthy that the Program Director who communicated Barksdale's offer for the Instructor position, Richard Herbert, also had a Ph.D. See Plaintiff's Exhibit 25.

ure. The reasons for the difference in treatment proffered by AUM are not so credulous that an inference of discrimination is totally lacking. Accordingly, plaintiff has produced sufficient evidence to demonstrate that there is a genuine issue of material fact whether she was intentionally subjected to differential treatment because of her gender. AUM is not entitled to summary judgment on this claim.

### 3. Retaliation

Plaintiff also contends that AUM subjected her to adverse employment decisions, specifically, not allowing her to teach summer classes in 1996; assigning her to pre-registration for the summer quarter although she had not been selected to teach any course; refusing to allow her to rent research equipment at AUM; refusing to renew her employment contract beyond the 1995–96 school year; refusing to consider her for a position with the endowment campaign; and denying her application for two advertised faculty vacancies in 1996.

 The law is well established that when a plaintiff relies on circumstantial evidence to support a claim of retaliation, she first must establish a prima facie case. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989). To satisfy this burden, plaintiff must show that (1) she engaged in protected activity; (2) she was subjected to adverse employment decisions simultaneous with or subsequent to such protected activity; and (3) a causal link exists between the protected activity and the adverse employment decision. *Id.* The causal link element requires the plaintiff to show that the "protected activity and the adverse employment action were not wholly unrelated." *Hairston,* 9 F.3d at 920 (*quoting Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir.1985)).

 Plaintiff alleges that her conversation with Hill in April, 1994, when she expressed her discomfort with Denton's treatment toward her, the initiation of the grievance procedure in August, 1994, her complaint to AUM's EEO officer in November, 1994 and filing a complaint with the EEOC in January, 1995 were protected activities for which AUM retaliated against her. There is no genuine dispute that plaintiff did express concerns about being subjected to harassment from Denton on each of these occasions. Thus, AUM, particularly Hill and Denton, certainly were aware of plaintiff's protected complaints at the time that she was subjected to the alleged employment decisions thereby satisfying a minimum requirement of a retaliation claim. *See Goldsmith v. City of Atmore,* 996 F.2d 1155 (11th Cir. 1993), *appeal after remand,* 47 F.3d 431 (11th Cir.1995). Plaintiff's ultimate burden, however, is to show that engaging in protected activity was the "but for" cause of the alleged adverse employment decision. *Alford v. City of Montgomery,* 879 F.Supp. 1143, 1152 (M.D.Ala.1995). With these principles in mind, the court will review each employment decision which plaintiff alleges was retaliatory.

#### a) Summer Teaching Position

To support her claim that she was denied a summer teaching position in 1996, plaintiff produced a memorandum to Denton wherein she requests consideration for such position that includes a notation from Hill to the Vice Chancellor of Academic Affairs that "Denton wants to terminate the relationship." [51] Given the relationship in time between plaintiff's request and AUM's denial of a summer appointment with her formal complaints and grievances, the court finds that there is sufficient evidence to raise a genuine issue of matter fact whether plaintiff was denied a summer 1996 appointment in retaliation for engaging in protected activity.

#### b) Summer Pre–Registration Duty

Plaintiff does not present any evidence that being required to assist with summer pre-registration was in some way an *adverse* employment decision. Additionally, there is no evidence that plaintiff was required to perform this duty but other faculty who had not engaged in protected activities were not. Accordingly, there is not sufficient evidence that a reasonable jury could find that plain-

---

**51.** Plaintiff's Exhibit 14. The memorandum is dated January 2, 1995. However, given the content of the memorandum and accompanying note it seems that the year is misdated and should have been 1996.

tiff was required to perform this duty in retaliation for engaging in protected activity.

### c) Renting Research Equipment

Plaintiff requested that she be permitted to rent research equipment from AUM after her employment relationship with the university terminated. She made this request to Hill. Hill contends that after consulting with the Vice Chancellors of Academic Affairs and Finance, he learned that AUM does not permit such rentals. Plaintiff has not submitted any evidence which contradicts that Hill consulted with the vice chancellors or that demonstrates that AUM has permitted rental by any other former faculty member. This aspect of plaintiff's retaliation claim is due to be dismissed.

### d) Extension of Employment Contract Beyond 1995–1996 Academic Year

Plaintiff was initially advised that an appointment for 1995–1996 would be the maximum allowable and final appointment on July 15, 1994.[52] This notice came from Denton. April, 1994, was the first time that plaintiff expressed her dissatisfaction of Denton's treatment toward her as sexually offensive and demeaning to Hill. On May 5, 1995, Hill advised plaintiff that she would receive an appointment for 1995–1996 but this would be her last appointment thereby making the end of her appointment with AUM June 15, 1996.[53] By that time, plaintiff had filed a formal grievance, a complaint with AUM's EEO officer and a charge with the EEOC. Hill and Denton were aware of these complaints and charges at the time that they communicated to plaintiff that 1995–1996 would be her maximum allowable appointment period. The 1995–1996 appointment would have been plaintiff's maximum allowable time because in accordance with the Faculty Handbook, had plaintiff been appointed any longer, she would have received *de facto* tenure. See Section III.B.5.b. at III.6. Thus, there was a legitimate reason for AUM not extending plaintiff's appointment beyond the maximum allowable time. Plaintiff has not submitted any evidence which indicates that the application of this policy was pretextual, or that another faculty member who had not engaged in protected activity had her appointment extended beyond the maximum allowable period. Accordingly, AUM is entitled to summary judgment on this portion of plaintiff's retaliation claim.

### e) Endowment Campaign Position

Plaintiff avers that she spoke to Dr. Saigo in January or February, 1996, about working with him in an endowment campaign position.[54] According to plaintiff, Dr. Saigo refused to consider her for the position because he was looking for someone nearing the end of his career and because plaintiff had filed an EEOC charge. Plaintiff does not present any evidence to show that a position was in fact available or that she applied for the position and was otherwise qualified. Plaintiff's bare assertion, without any corroboration, that she was not given the position because she had filed an EEOC is insufficient to support a claim of retaliation.

### f) Biology Department Faculty Positions Advertised for September 1996

AUM advertised two faculty positions in March, 1996 for a September 15, 1996 appointment. One position was for a tenure track appointment, the other was a temporary appointment. The tenure track appointment listed "Ph.D. in Environmental Biology/Ecology with experience in applied ecology and higher plants." The temporary appointment required "Ph.D. in Biology for appointment as Assistant Professor or an Master of Science for appointment as Instructor." Plaintiff applied for both positions but she was not among the candidates selected for an interview. According to Hill, the temporary position was not filled due to budgetary constraints and the environmental appointment was awarded to one of the three candidates selected for an interview. Plaintiff does not present any evidence to compromise AUM's representation that the temporary position was not filled due to budgetary constraints. Additionally, there is no evidence to demonstrate that plaintiff was qualified for the environmental appointment and would have been selected for that position

---

52. Defendant's Exhibit 19.

53. Defendant's Exhibit 62.

54. Plaintiff's Affidavit at ¶ 32.

"but for" AUM's retaliation against her. This portion of plaintiff's retaliation claim is also due to be dismissed.

Based upon the foregoing, the court finds that AUM is not entitled to summary judgment on plaintiff's claim alleging that she was denied a summer appointment in 1996 in retaliation for engaging in protected activity, but it is entitled to summary judgment in its favor on the remainder of plaintiff's claim alleging retaliation.

### 4. Assault

 Under Alabama law, assault consists of an intentional, unlawful offer to touch a person coupled with the present ability to do so, such that the words or action create a reasonable fear of imminent contact. *Holcombe v. Whitaker,* 294 Ala. 430, 318 So.2d 289, 294 (1975). Although words, standing alone, do not constitute assault; when considered in combination with an offender's show of force or other action, a cause of action for assault may lie. *Id.* If there is a genuine dispute whether the defendant's conduct was intended to "create a reasonable or well-founded apprehension of imminent harm" so as to constitute assault, summary judgment is inappropriate. *Saville,* 852 F.Supp. at 1542 (*quoting Allen v. Walker,* 569 So.2d 350, 352 (Ala.1990)).

 Denton argues that plaintiff's assault claim must fail because there is no evidence that he touched plaintiff in a "rude, hostile or angry manner." Plaintiff concedes that Denton did not act in an angry or openly hostile manner or overtly, threaten her physically. See Plaintiff's Rebuttal to Dr. Thomas Denton's Memorandum in Reply filed June 10, 1997 at 11. Plaintiff contends that her allegations of rude touches and offers to touch were unprofessional manifestations of hostility sufficient to state a claim of assault. Plaintiff relies heavily on *Saville* to support her claim that whether Denton's demeaning and humiliating conduct constitutes assault is a question for the jury. This reliance, however, is misplaced.

In *Saville,* the assaultive conduct was grabbing plaintiff's buttock as well as sexually harassing statements. The question of fact reserved for the jury was whether the touch was done in a joking or teasing manner. *Saville,* 852 F.Supp. at 1542. In the pending action, the complained of touches consists of "playing footsie," rubbing plaintiff's neck and shoulder and standing too close behind her. Plaintiff does not allege that any of these instances of "contact" were accompanied by menacing or offensive comments. *See, e.g., Brassfield v. Jack McLendon Furniture, Inc.,* 953 F.Supp. 1438, 1459 (M.D.Ala.1996). Additionally, plaintiff does not contend that at any time she felt threatened by Denton's conduct. Plaintiff describes Denton's conduct as unwelcomed and humiliating, however, she never expresses that she felt imminent physical harm. *Cf. Allen,* 569 So.2d at 352 (plaintiff testified that she became so frightened and upset that she had to leave work). Accordingly, the court finds that there is not sufficient evidence to raise a jury question on plaintiff's assault claim. Denton is entitled to summary judgment on this claim.

### 5. Tortious Interference/Business Tort

Plaintiff contends that Denton's malicious opposition and intentional interference with her ability to continue her employment at AUM, particularly, undermining her attempt to attain tenure, constitutes a cause of action for tortious inference with contractual relation.

 A plaintiff establishes a prima facie case of intentional interference with contractual relations by establishing the following elements:

(1) defendant's knowledge of the contract or business relation;

(2) intentional interference by the defendant with the contract or business relation; and

(3) damage to the plaintiff as a result of defendant's interference.

*Lowder Realty, Inc. v. Odom,* 495 So.2d 23, 25 (Ala.1986). When the named defendant is an employee or officer of a corporation or employer with a contractual or business relationship with plaintiff, as oppose to the entity itself, the individual defendant may be subject liability for tortious inference only if he acted outside the scope of his employment and acted with actual malice at the time of his alleged interference. *Hickman v. Winston County Hosp. Bd.,* 508 So.2d 237, 239

(Ala.1987). If a plaintiff fails to satisfy either of the *Hickman* elements, summary judgment in favor of the defendant is appropriate. *See Hanson v. New Technology, Inc.*, 594 So.2d 96 (Ala.1992).

Since an action for tortious interference will not lie against an employee or officer for conduct within the general range of his authority which he exercises for the benefit of the employer, *Hickman*, 508 So.2d at 239–240, an employee will be subject to liability only if he abandons his employer's business in a "very marked and unusual" manner. *Prosser v. Glass*, 481 So.2d 365, 368 (Ala. 1985). A plaintiff may show the defendant employee's conduct sufficiently deviated from the scope of his authority by demonstrating that the employee played a direct role in interfering with plaintiff's business relation and acted in such a manner in order to obtain a personal benefit. *See Pegram v. Hebding*, 667 So.2d 696, 701–702 (Ala.1995). To establish the "actual malice" element, plaintiff must make "a strong showing of a pattern of interference." *Perlman v. Shurett*, 567 So.2d 1296, 1299 (Ala.1990) (*quoting Hickman*, 508 So.2d at 241 (*Adams, J., concurring specially*)).

■ Based upon the court's review of the evidence, the court finds that plaintiff fails to demonstrate that Denton acted outside the scope of his authority and to submit sufficient evidence to present a jury question whether Denton acted maliciously in his conduct related to plaintiff continuing her employment relationship at AUM. As the Chair of the Biology Department, it was within the scope of Denton's authority to initiate and participate in the process for promoting and awarding tenure to Biology Department staff. Whether plaintiff was promoted or attained tenure would not affect Denton's status. The personal benefit that plaintiff infers would have motivated Denton to interfere with her employment relationship with AUM, having her leave the university because she complained about his conduct toward her, would not have been realized because plaintiff had expressed her dissatisfaction with Denton's conduct toward her to Dean Hill before the faculty polling. Thus, since the evidence does not demonstrate that Denton acted outside the scope of his authority during plaintiff's promotion

and tenure process, plaintiff's claim for tortious interference with a business or contractual relation cannot survive summary judgment.

### 6. Fraud

■ Plaintiff contends that she has an actionable claim for fraud against Denton based upon his misrepresentation to her that getting a Ph.D. and engaging in research and university service would put her on the tenure track, and that he and the Biology Department would support her for tenure, and based upon his failure to disclose that he had no basis for making such assurances since he was aware as early as 1989 that the faculty would not support awarding plaintiff tenure. Plaintiff contends that based upon Denton's representations to her she undertook a doctoral studies program and research projects that she would not have pursued otherwise, and she maintained an unreasonable expectation of her career opportunities at AUM.

■ Plaintiff bases her fraud cause of action on two theories: misrepresentation of material fact and suppression of material fact. To recover in fraud based on misrepresentation of material fact the plaintiff must show (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance. *Harrington v. Johnson–Rast & Hays Co.*, 577 So.2d 437, 438–439 (Ala.1991); *Hammond v. City of Gadsden*, 493 So.2d 1374, 1377 (Ala.1986). *See also* ALA.Code § 6–5–101. The requisite elements of fraud by suppression include: (1) the suppression of a material fact; (2) that the defendant was under a duty to communicate; (3) either because of a confidential relation between the plaintiff and the defendant or because of the particular circumstances of the case. *Crowder v. Memory Hill Gardens, Inc.*, 516 So.2d 602, 604 (Ala. 1987). *See also* ALA.Code § 6–5–102. Additionally, proof of reliance is an essential element of a cause of action based on fraud. *See Hancock v. New York Life Ins. Co.*, 899 F.2d 1131 (11th Cir.1990)(damages sought must be proximate result of plaintiff's reli-

ance alleged misrepresentation); *Torres v. State Farm Fire & Cas. Co.*, 438 So.2d 757, 758 (Ala.1983)(same); *Wolff v. Allstate Life Ins. Co.*, 985 F.2d 1524, 1531 (11th Cir.1993) (reliance is an essential element of a fraudulent suppression claim); *First Bank of Boaz v. Fielder*, 590 So.2d 893 (Ala.1991)(same).

Since a factual misrepresentation is inherent to a cause of action alleging fraud, whether based on misrepresentation or suppression, the court first must determine whether the statements allegedly misrepresented or suppressed were material facts or merely statement of opinion. *See McGowan v. Chrysler Corp.*, 631 So.2d 842 (Ala.1993). " 'Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties. The mere form of the representation as one of opinion or fact is not in itself conclusive, and in cases of doubt the question should be left to the jury.' " *Id.* at 847 (*quoting Harrell v. Dodson*, 398 So.2d 272, 274–75 (Ala.1981)).

In this action, plaintiff is attempting to impose liability based on fraud on Denton for sharing with plaintiff his assessment of what she needed to do to make herself a viable candidate for tenure at AUM. Considering the evidence in the light most favorable to plaintiff, the court is bound to accept plaintiff's averments that Denton told her she would have to be working toward her doctorate and participating in research projects, and that he would lend his support to her in the process. The representations about pursing a doctorate degree and participating in scholarly activities are consistent with the Faculty Handbook provisions addressing appointment, promotion and tenure policies. See III. B *et al.* The handbook provision also advises a faculty member that members of her department will be polled for recommendations of promotion or tenure. This information also was disclosed to plaintiff by Denton, as well as Dean Hill. Denton's representation that the faculty would support plaintiff in quest for promotion and tenure could not reasonably be construed as anything more pure speculation—an opinion. Denton's position as department head did not give him any clairvoyant powers on matters related to promotion and tenure that required him to make any particular disclosures to plaintiff. Plaintiff's contention that Denton's conduct, along with the fact that she did not receive a written contract annually as is required for faculty with temporary status, fraudulently led her to believe that she was in tenure track position is specious. The contract effective at the time that plaintiff began her doctoral studies and engaged in research appointed her as an Instructor, temporary status. The Faculty Handbook clearly identifies the procedures and process for promotion, change of status and tenure. Absent the execution of another contract of appointment there was no reasonable basis for plaintiff to believe that her status enigmatically became probationary and placed her on a tenure track. Given the profession and intellect of the plaintiff and Denton, the availability of the Faculty Handbook as a resource to provide plaintiff with guidance for pursuing promotion and tenure, and the fact that Denton's representation did not contradict the information provided in the handbook, the court finds that there is not substantial evidence from which it could be reasonable to infer that Denton made factual representations which fraudulently misled plaintiff regarding her career opportunities at AUM. Denton is entitled to summary judgment on plaintiff's claim alleging fraud.

## III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment filed by Auburn University at Montgomery on February 18, 1997 is DENIED as to plaintiff's claim alleging that she was denied promotion and tenure because of her gender and that AUM retaliated against her for complaining that she was subjected to disparate treatment and sexual harassment by denying her a summer appointment in 1996, and is GRANTED in all other respects. The motion for summary judgment filed by Denton on February 18, 1997 is GRANTED and all claims against Denton are hereby DISMISSED.